RAYMOND KENNY, *Director Public Assistance, etc. v.*
COUNTY COURT OF WEBSTER COUNTY *et al.*

(No. 9370)

Submitted June 8, 1942. Decided June 23, 1942.

*W. S. Wysong,* Attorney General, and *Kenneth E. Hines,* Assistant Attorney General, for petitioner.

*Wendell Hoover,* for respondents.

Fox, PRESIDENT:

Raymond Kenny, Director of Public Assistance, seeks a mandamus to compel the County Court of Webster County to transfer from the general county fund to the general relief fund of that county the sum of $3100.00, being the balance of $4100.00 estimated for that purpose in the 1941-42 fiscal year budget, approved by the State Tax Commissioner on the 21st day of August, 1941, and to cover which levies were imposed upon the real and personal property subject to taxation in said county.

On May 6, 1941, the County Court of Webster County and the County Public Assistance Council applied to the State Department of Public Assistance for a state grant for the purpose of providing for general relief in said county, on the ground that the amount required by section 5, article 10, chapter 9 of what is generally referred to as the Public Welfare Law of 1936, as amended, would be insufficient for said purpose, and in said application the estimated total expenses for general relief in the county was fixed at the sum of $30,000.00. In this application, it was represented that a separate item would be included in the amount to be levied for current purposes in accordance with section 4, article 10, chapter 9 of the Public Welfare Law, and it was further represented that the general relief fund of said county would not be less than fifteen per cent of the total amount which the county court might legally levy for current purposes, as authorized by general law, unless excused therefrom under the provisions of section 5, article 10 of the welfare law. There has been actually expended in Webster County from July 1, 1941, to May 25, 1942, the sum of $30,801.89, all of which has been furnished by the state, except $1,000.00 transferred from the county fund to the general relief fund. At sometime between the date of the application above mentioned, and the approval of the

budget hereinafter mentioned, the county court petitioned the State Tax Commissioner to reduce the amount to be levied and transferred from the general fund of the county to the county relief fund, but that application was denied, and the county court was required to put in its budget, for general relief purposes, the sum of $4100.00.

On August 5, 1941, the county court made up its annual estimate of receipts and expenditures for the current fiscal year, and filed the same with the State Tax Commissioner. In this estimate, the total expenses of the county, including $4100.00 to be transferred to the general relief fund, was the sum of $43,089.00. From this was deducted $2750.00, estimated as probable receipts from county offices, leaving a balance to be covered by levy on property of $40,339.00, and thereafter a levy order was entered imposing levies upon the real and personal property of the county sufficient to cover that sum. At sometime during the fiscal year, the county court transferred to the general relief fund the sum of $1,000.00, leaving a balance of $3100.00, of the amount budgeted for that purpose, unpaid. The Department of Public Assistance having made demand for such balance, and the payment thereof being refused, instituted this proceeding to compel the county court to make such transfer.

Numerous questions involving the constitutionality of the Public Welfare Law are raised on the record, and require our attention before we enter upon a discussion of the factual matters involved.

The basic question is the responsibility of the state for public assistance and relief. If that be a state function, the exercise thereof rests largely, if not entirely, with the Legislature, and it has power, so long as it does not encroach upon constitutional inhibitions, to use the agencies of the state in carrying out any policy upon which it may determine. We think the authorities are in accord with the idea that the care of the dependent classes is a function of government.

"The care of the state for its dependent classes is considered by all enlightened people as a measure of its civilization, and the care of the

poor is generally recognized as among the unquestioned objects of public duty, but in spite of this, the duty under the common law was purely moral and not legal. There is therefore no legal obligation at common law on any of the instrumentalities of government to furnish relief to paupers. The obligation to support such persons results only from statute." 21 R. C. L. 701.

See also, *State* v. *Nelson County*, 1 N. D. 88, 45 N. W. 33, 8 L. R. A. 283, 26 Am. St. 609; *Rummens* v. *Evans*, 168 Wash. 527, 13 P. 2d 26; *Jennings* v. *City of St. Louis*, 332 Mo. 173, 58 S. W. 2d 979, 87 A. L. R. 365. Whatever may have been the rule in the past, both the state and Federal governments have, in recent years, fully recognized their obligations to provide for the relief of indigent persons, and they have done so by appropriate legislation. As stated above, there was no rule at common law which required such assistance, but that does not mean that the state does not have the right to provide therefor as necessity arises. Under our system of government, all power rests with the people, and they may delegate or vest that power wherever they choose. They have chosen to vest a part of those powers in the three branches of our government, the legislative, the executive and the judicial, but not necessarily all. This is recognized in Article III, Section 3 of our state constitution, and by the Tenth Amendment to the Federal Constitution, which provides that "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." These reserved powers fall within the scope of legislative power, as, in a general sense, they can only be exercised through legislative authority. True, certain inherent powers in courts may be exercised, and in emergency cases, the executive may be warranted in extending its power, but these are exceptions, closely limited, and not the rule. Authority to exercise the powers of government, originally vested in the people, rests in the Legislature, and are only limited by the restrictions which the people themselves have placed thereon in the written constitu-

tions adopted for the state and federal governments. The case of *State Road Commission* v. *County Court,* 112 W. Va. 98, 163 S. E. 815, is the leading case in this state on legislative power. In an able opinion by Judge Hatcher, this Court held that "The general powers of the Legislature are almost plenary. It can legislate on every subject not interdicted by the constitution itself." Under our system of government, all legislative powers were originally vested in the Legislatures of the several states, subject only to the restrictions placed thereon by the charters or constitutions of the several states. Some of these powers afterwards were surrendered to the Federal government when the Federal Constitution was ratified. All others remained. We think, therefore, that relief of indigent persons being a function of government, and the exercise of that function not having been delegated to any other branch of the government, can be called into being by legislative action, and, therefore, the Legislature had full power to enact the Public Welfare Law of 1936, under which public relief is now being administered.

Respondents seem to proceed on the theory that county courts have some special responsibility for relief, and they refer to Code, 9-10-1. That section reads:

> "The support of public assistance is hereby declared to be the responsibility of the State. The support of general relief is hereby declared to be the responsibility of the county. To the extent that a county is unable because of constitutional restrictions to meet reasonable costs of general relief as required by this article, the responsibility of the State is hereby recognized."

What is "Public Assistance" is defined in Code, 9-5-2, and "General Relief" is defined in Code 9-6-2. And in Code, 9-10-3, general relief is further defined as follows:

> "For the purpose of this article general relief shall mean cash or its equivalent in services or commodities expended upon the order of the county council or county director for general relief other than for care in a county infirmary,

child shelter, or similar institution, except as to contributions provided for in section three-a, article seven of this chapter."

Section one, quoted above, does declare the responsibility of the county for general relief, but, reading the entire article, we find that it was only intended to declare that responsibility to the extent that constitutional restrictions as to costs would permit the same, for the reason that sections following in the same article provide for state aid, and aid by the state is clearly contemplated.

There is nothing in our constitution which imposes any duty on the county court with respect to the care of the poor. Section 2 of Article VII of the Constitution of 1863, provides for the election of an overseer of the poor, and in section 4 of said article, it is provided that:

"The Board of Supervisors of each county, a majority of whom shall be a quorum, shall, under such general regulations as may be prescribed by law, have the superintendence and administration of the internal affairs and fiscal concerns of their county, including the establishment and regulation of roads, public landings, ferries, and mills; the granting of ordinary and other licenses; and the laying, collecting, and disbursement of the county levies; * * *."

The Constitution of 1872, Section 24, Article VIII, dealing with the powers of county courts, which succeeded the Board of Supervisors, provides that:

"They shall also, under such regulations as may be prescribed by law, have the superintendence and administration of the internal and police and fiscal affairs of their counties, including the establishment and regulation of roads, ways, bridges, public landings, ferries and mills, with authority to lay and disburse the county levies; * * *."

And in Section 2 of Article IX of said constitution, the appointment of overseers of the poor by county courts is authorized. These are the only provisions of the constitu-

tion which relate to the poor, and it can hardly be said that the first has any application to the poor, unless it be included as coming within the police powers committed to the county courts by the constitution. Under the constitutions, from which quotations have been made, the Legislature did impose upon county courts certain responsibilities with respect to the poor. Chapter 46, Code 1868; chapter 46, Code 1923. The practice grew up, under these statutes, of leaving to the county courts the entire burden of providing for the poor in the respective counties of the state. But it should be borne in mind that if the duties and responsibility of the county courts with respect to the care of the poor were created and conferred by the Legislature, it must be held to have the authority to take away such powers, and to relieve the county courts of such duties, in whole or in part. Our present laws with respect to aiding the poor have been radically changed. Activities in connection with aid to the poor have been largely expanded and the money expended therefor greatly increased. In the meantime, constitutional changes with respect to the limitation of levies which county courts and other fiscal bodies could impose have made it impossible for the county courts to provide for relief on modern standards. It is easy, therefore, to understand why the Legislature saw the necessity of assuming for the state the responsibility for public assistance. But not being willing to relieve the counties entirely of their responsibility in that connection, it, for the first time, declared that general relief was the responsibility of the county, as the basis, no doubt, for the subsequent provisions requiring the creation of a county general relief fund, but in doing this, it seemingly recognized that relief could not, as a practical matter, be furnished by the counties, and that to the extent that counties could not meet the reasonable costs thereof, the responsibility of the state was recognized, and this responsibility was met by the provisions for state aid following.

We are unable to see that the setting up of a county public assistance council, of which the president of the county court is *ex officio* a member, and through which relief is

administered, infringes, in any improper manner, upon the prerogatives of the county court. If such an action does violate any provision of the constitution, as applied to county courts, it is an infringement of that section thereof which provides that county courts shall have superintendence and administration of the internal police and fiscal affairs of the county. Again, attention is called to the fact that this power is to be exercised "under such regulations as may be prescribed by law." The enactment of law is a legislative prerogative, so that the clear meaning of the constitution is that under such regulations as may be prescribed by the Legislature, through its enactment of laws, county courts shall have such superintendence. The constitution having imposed no duty on the county courts with respect to the poor, and that being a proper function of the government, which could only be exercised through legislative power, the authority of the Legislature with respect to the carrying into effect that purpose is full and complete.

That the power of the county courts, in the superintendence and administration of the internal police and fiscal affairs of their counties has, from the very beginning of our statehood, been controlled and restricted by legislative authority, can be illustrated in many ways. For example, the power to control levies has been exercised, and upheld by decisions of this Court. In *Dillon* v. *County Court,* 60 W. Va. 339, 55 S. E. 382, it was held that the power of taxation was vested in the lawmaking body of the state, and that county courts are subject to legislative control in respect to the amount of money they may raise by taxation for county purposes. That was a case where a statute provided that a county might not levy taxes which should exceed by more than five per cent the aggregate amount of taxes levied in the preceding year, and the holding was that such limitation was within the power of the Legislature. To the same effect is *Pfalzgraf* v. *Wood County Court,* 73 W. Va. 723, 81 S. E. 397; *Huntington Chamber of Commerce* v. *Public Service Commission,* 84 W. Va. 81, 99 S. E. 285. As to the power of the

Legislature to control the administration of the affairs of a county, see 15 Corpus Juris, 420; 7 R. C. L. 926; 14 Am. Jur. 202; 1 Cooley on Taxation, 907.

Our statutes of today definitely and precisely limit and control every fiscal body in the state in the matter of levies they can lay for particular purposes. In respect to the bonded and contractual indebtedness of the subordinate divisions of the state, the Legislature, on estimate of probable cost of meeting the interest and sinking fund requirements, has, for many years, required a certain percentage of levies to be set aside for that purpose. It has fixed the salaries of county officials; the fees which they may collect; the cost of keeping prisoners in jail; compensation of jurors and of election officers; fees for publication of notices and statements required by law; and many other items of expense, payment whereof is required to be made out of county levies. So that the control of fiscal affairs of the county by the Legislature is not a new thing. If the Legislature can do these things, we think it can also require the county courts to make a contribution for relief purposes, providing such requirement does not interfere with the payment of mandatory expenses necessary to the preservation of local government in the counties.

It is contended that the furnishing of state aid to the counties, in connection with general relief, violates Section 6 of Article X of the Constitution, which provides that "The credit of the State shall not be granted to, or in aid of any county, city, township, corporation or person; * * *." This cannot be true, if the problem of relief is primarily the responsibility of the state. The mere fact that in carrying out this responsibility, the state, through its Legislature, requires contribution thereto by the counties, does not prohibit the state from exercising its own prerogatives and from using the county courts as agencies in carrying out its own purposes, and the amount it contributes to the county general relief, by way of state aid, is not lending the credit of the state to the county. The case of *Berry* v. *Fox*, 114 W. Va. 513, 172 S. E. 896, is

strongly relied upon by the respondent, as prohibiting state aid to counties under the General Welfare Law. We do not think that case applies to the present situation. In that case, what the state was trying to do was to provide for the payment of the bonded indebtedness of road and school districts, which had been created by a vote of the people, and which was, therefore, clearly the responsibility of the several fiscal divisions which created the debts. Here we say that relief being primarily the responsibility of the state, Section 6 of Article X of the Constitution was not intended to inhibit the state from contributing, through county agencies, to the carrying out of its responsibility in that connection.

The same principle governs in connection with the contention that the taking of state funds collected from other counties of the state, and using them for the relief of indigent persons in another county, violates the Fourteenth Amendment to the Federal Constitution, in that it takes the property of individuals without due process of law. State funds, wherever collected in the state, may be expended anywhere within the state, if for a state purpose; therefore, if relief by the primary obligation of the state, it matters not that a disproportionate part of the state revenues may be collected in the wealthy counties of the state and distributed among the less wealthy. This is done in many instances, a particular illustration of which is, state aid to the counties for school purposes. The education of the youth of the state is recognized as a state function, yet the counties are required to contribute to the support of schools, and the state provides aid to the counties, through local boards of education, who administer the schools in their respective counties.

Nor is there any point in the contention that the Legislature may not require executive and administrative bodies of the state to administer laws which it is authorized to enact. Of course, there are instances when the Legislature cannot impose powers upon other branches of the state government, particularly the judicial department, for the reason that under our plan of government,

one department may not encroach upon the rights and prerogatives of another, or impose duties not authorized by the constitution. We have many times held that courts may not, as a general rule, be called upon to assume administrative powers. The leading case on this point is *Hodges* v. *Public Service Commission,* 110 W. Va. 649, 159 S. E. 834.

There would seem to be no constitutional restriction against setting up county assistance councils, and making the president of the county court an *ex officio* member thereof. No doubt this was done for the reason that the county courts, making some contribution to the general relief fund of the county, should have a voice in its expenditure. The county court is, for most purposes, a nonjudicial body, and the requiring of it the performance of administrative duties is not an unwarranted exercise of legislative power.

Having disposed of the several constitutional questions raised on the record, we think it proper at this time to consider whether we should award mandamus in cases of this character. The answer to this question, we think, depends on whether a county court, in a given case has funds in its hands, available, or potentially available, to meet the call of the Legislature under the General Welfare Law, after the mandatory expenses, necessary to the administration of constitutional government in the county have been met. Fundamentally, relief is a moral and social obligation of the government, but not mandatory in its character. Important as it may be to provide for the relief of indigent persons, the preservation and administration of constitutional government is of still greater importance, for such government is necessary for the protection of citizens of all classes, and is of paramount importance. We cannot have constitutional government in the counties without courts for the control of their fiscal affairs; taxes must be collected, and therefore, we must have assessors and sheriffs; law and order must be preserved, and crime suppressed, therefore, we must have courts, not only to try persons accused of crime, but settle

disputes of a civil nature which arise between citizens, and such courts must have clerical assistance; juries must be summoned and paid; we must have officers to apprehend and prosecute alleged criminals; jails must be built and maintained, and prisoners fed; and elections must be held for the selection of officials, county, state and national. All these, and many others which might be mentioned, are the mandatory expenses necessary to the functioning of constitutionally required activities of county government, and they should be met before the Legislature is warranted in requiring contribution by the counties for relief. This theory is implied in the act under which the relator herein operates, because, in section 5 of article 10 of chapter 9 of the Code of 1937, as amended by Chapter 74 of the Acts of the Legislature, 1941, it is provided that:

> "The county court shall levy for general relief not less than the amount so determined and agreed: *Provided further,* That if a county court finds that expenditures mandatory under other provisions of law aggregate in excess of eighty-five per cent of the total amount which the county court is authorized by law to levy for current purposes, the court may petition the tax commissioner for authority to provide an amount less than that required by the first paragraph of this section. If the tax commissioner finds that other mandatory expenditures for the county will exceed eighty-five per cent of the authorized total levy for current purposes, he may authorize the county court to provide a lesser amount than that required by said first paragraph, but he shall require the maximum amount possible under the circumstances."

This provision can only mean that the mandatory expenses of county government must be paid, and that the inhibition against transfer from the county fund to any fund other than the county general relief fund (Code, 9-10-6) must be interpreted subject to this limitation. The State Tax Commissioner, being acquainted with the necessary

and mandatory cost of such government, should not impose upon the county courts, by way of requiring a contribution to the county relief fund, a burden beyond their ability to carry. If this were a case where the mandatory expenses of county government, as defined above, required the entire revenues of the county, this Court would not issue the writ of mandamus, when the effect would be to compel a violation of the law by the county court, with the attendant criminal and civil liabilities imposed by statute law. Both the Legislature and state officials should refrain from imposing upon county courts, and other fiscal bodies, greater burdens than their revenues justify. Each department of state government is charged with certain duties and responsibilities, and should not be interfered with by any other department when acting within the scope of their powers. It is not the office of this Court to criticise either the Legislature, or state officials, as to the manner in which they discharge such responsibilities, but when the processes of this Court are invoked, and the issuance of a writ, such as is sought in this case, would require, not only the violation of express provisions of statute law against the expenditure of funds in excess of those available, but would create risks of severe criminal and civil penalties against local officials, we will have no part in such a travesty on the orderly administration of the fiscal affairs of a county.

We now come to the question of whether the fiscal situation of the County Court of Webster County will justify the transfer by it of the balance due to the county general relief fund without an overdraft in the general county fund. We think it must be admitted that the requirements of the statute, which apply to all the counties of the state, are not unreasonable, provided, the funds are available therefor, after the burdens of local government, mandatory in character, have been met. Recent legislative policy has served to relieve the counties of a great burden in matters of relief, notwithstanding the present requirement of contribution. Prior to the enactment of these laws, the burden of the poor rested upon the counties alone. That

burden, as far as the county of Webster is concerned, has amounted to more than thirty thousand dollars for the present fiscal year, and the contribution asked for is $4,100.00, leaving the balance to be provided by the state. It is obvious that Webster County could not meet this total burden for the current year, and still maintain a county government; nor if relief is to be administered on this scale, can it do so in the future. We think, therefore, that it is not only the statutory duty of the county court to make the required contribution, provided it has funds available therefor, but its moral duty as well. If it has such funds available, then the relator herein has a clear legal right to have the same transferred to the county general relief fund. The only question is: Does the county court have funds available for that purpose?

There has been admitted in evidence, by stipulation, an audit of the fiscal affairs of the county from July 1, 1941, to May 27, 1942, leaving a little more than a month of the present fiscal year to be covered. In that audit, account is taken of all the current year orders issued, and the estimated amount necessary to pay salaries, unpaid bills, and other expenses, to the end of the fiscal year. These amounts aggregate the sum of $41,085.93. This sum does not include the $3,100.00 claimed to be due to the county general relief fund. The total receipts which will go into the county fund for the present fiscal year, not taking into consideration delinquencies, and treating all receipts as potentially available, amount to $49,048.16, which includes the balance in the fund as of July 1, 1941, of $373.68, $30,422.55 levied on property, public service taxes received, sheriff's tax sales and redemptions, earnings of county offices, partly estimated, miscellaneous receipts, all aggregating the figure above mentioned. Deducting the expenditures from the total receipts, we have a potential balance of $7,962.23. If the $3,100.00 is transferred to the county general relief fund, that balance is reduced to $4,804.16. In the total receipts, there is included uncollected taxes amounting to $10,236.19. Of course, it must be recognized that all of those taxes will not be collected by the sheriff. In the budget, prepared in

August, 1941, delinquencies were estimated at $2,500.00. For the purposes of this case, we may assume that they will not be less than that sum, and will probably exceed that sum, but such delinquencies can hardly exceed the sum of $4,862.23, which would be the balance in the county fund after the transfer of the fund in question to the county general relief fund. Therefore, it would appear from this statement that the County Court of Webster County may well transfer the sum of $3,100.00, as sought by the relator, without sacrificing any mandatory functions of the county government, and without creating an overdraft in the county fund. The figures presented are convincing on that point, and they are not controverted.

We have treated the total levies, subject to delinquencies, as a fund potentially in the hands of the county court to be expended by it. As to this, we find the governing rule laid down in *County Court of Roane County* v. *Phillips, Sheriff,* 121 W. Va. 438, 4 S. E. 2d 425. A county court may issue orders to the amount of the levies which are potentially available within the current fiscal year, notwithstanding the fact that, at times, the sheriff may not have in his hands the actual money with which to meet such orders. Contemplating this situation, we find a provision which authorizes the indorsement of the orders when presented to a sheriff who does not have in his hands sufficient funds with which to pay the same. The mandamus which will issue in this case will be against the county court alone, and will require the transfer of the fund in question, but not require its payment by the sheriff. Indeed, that character of relief could not be awarded herein, because only the county court, as a corporation, and the individual members thereof, are made parties.

We have not considered the negotiations with respect to the occupancy of certain rooms in the courthouse as having any bearing on this controversy. If the department of public assistance had the right to have this fund transferred to the general relief fund of the county, it did not have authority to waive that right by the character of agreement which the county attempts to enforce, to say

nothing of the obligation of the county court to furnish rooms for the use of the county public assistance council.

Holding that the Public Welfare Law of 1936, as amended, is constitutional; and believing that the respondent, the County Court of Webster County a corporation, can meet the requirement of said law, and its undertaking thereunder, as set out in its application for state aid, dated May 6, 1941, without impairing the administration of local government in the county, and without creating an overdraft in its general county fund; we hold that the relator has a clear legal right to have transferred, as prayed for, the sum of $3100.00, involved in this controversy, and a peremptory writ of mandamus, requiring the County Court of Webster County to transfer from the general county fund to the general relief fund of said county the sum of $3100.00, will issue.

*Writ awarded.*