STATE OF WEST VIRGINIA *ex rel.* THE BOARD OF GOVERNORS OF WEST VIRGINIA UNIVERSITY

*v.*

EDGAR B. SIMS, *Auditor, etc.*

(No. 10271)

Submitted April 25, 1950. Decided May 23, 1950.

Lovins, President, not participating.

*William C. Marland,* Attorney General, and *Eston B. Stephenson,* Assistant Attorney General, for petitioner.

*Milton S. Koslow* and *George W. Stokes,* for respondent.

Riley, Judge:

In this original proceeding in mandamus, the relator, Board of Governors of West Virginia University, seeks to compel Edgar B. Sims, Auditor of the State of West Virginia, by peremptory writ of mandamus to honor requisition No. 3016, providing for the payment to the Monongalia General Hospital of $116.35, to Dr. Justus C. Pickett, $125.00, and to Dr. Eldon B. Tucker $15.00, aggregating $256.35, and to draw his warrant in said several amounts payable to the said claimants.

This case is submitted on the petition filed by relator; the answer of the respondent auditor; the replication to the respondent's answer; and depositions filed as a part of the record of this proceeding.

On or about March 20, 1950, at relator's direction, requisition No. 3016, signed by Dr. C. T. Neff, Jr., vice-president of West Virginia University, was drawn on account No. 6631-1, the State Special Athletic Receipts Fund, for the purpose of paying three certain invoices directed to the athletic department of West Virginia University, covering the aforesaid claims for services rendered J. Robert Murphy, a student at the university and a member of its football team, consisting of hospitalization and medical treatment in connection with injuries received by Murphy while participating for the university in an intercollegiate athletic contest. The fund on which these claims was drawn is a special collection fund, consisting of money received from gate receipts derived from general admission charges, compulsory student athletic fees and the

amount of guarantees paid on behalf of competing athletic teams.

The relator urges that the fund is more than ample to meet the charges made upon it for athletic expenditures, including hospital and medical expenses, as evidenced by the fact that there has been a balance or profit in the fund since the year 1939 above costs and expenses incurred against the fund; but from respondent's answer it appears that for the fiscal year ending June 30, 1949, the receipts and expenditures of the fund were as follows: Compulsory student athletic fee collections, $100,120.20; gate receipts, $88,690.99; and guarantees, $54,434.07, making a total of $241,245.26, and that the total expenditures from the fund for that fiscal year were in the amount of $240,709.34, making a net profit for the year of $535.92. The respondent auditor, however, contends that said sum of $535.92 was not a true profit, as the salaries of the athletic director, Roy M. Hawley, the director of publicity for athletics, and various head and assistant coaches were, in part, paid from the general revenue of the State in the amount of $10,050.00 to the school of physical education and athletics account No. 4650 and to intercollegiate athletic account No. 11100 in the amount of $30,350.00, or a total of $40,400.00.

From the depositions taken, especially the testimony of Dr. Neff, who in addition to being vice-president and comptroller of the university, is secretary of the board of governors, it appears that for many years in the past the director of athletics has made arrangements, without participation of the student, with physicians and hospitals when an injured athlete requires hospitalization or medical services; and further that it has been the custom of the athletic department to submit requisitions for and pay hospital bills and medical expenses of injured athletes when required. Dr. Neff testified that it is the general custom, not only of the university but of every college and university concerning which he has knowledge, that injuries resulting from athletic contests are taken care of by the institution itself. However, witness was unable to

testify that there had been a holding out to students of the university who participate in athletic contests that their hospital and medical expenses would be paid out of the athletic fund.

Further this record discloses that respondent auditor until very recently has honored requisitions for medical and hospital expenses such as are involved in this proceeding. While the respondent auditor testified that generally until recently claims such as those under appraisal have not been brought to his personal attention, it appears that on June 23, 1939, on the advice of the attorney general, the auditor honored a claim, dated October 5, 1926, of Dr. Chesney M. Ramage, for services rendered one Russell Nuzum, an injured athlete, whose injury consisted of a broken leg. This latter claim, however, unlike the instant claim, was based on a specific Act of the Legislature, 1939, Chapter 7, authorizing payment to Dr. Ramage.

It is contended by the relator that the hospitalization and medical expenses involved here are an incidental expense of the athletic department in maintaining the athletic program in the administration of the affairs under the supervision of the department. Reliance is had on Section 2, Article 1-a, Chapter 83, Acts of the Legislature, Regular Session, 1943, which reads as follows:

> "The directors of athletics at state educational institutions may fix and charge admission fees to athletic contests at state educational institutions, and may enter into contracts, spend and receive money under such contracts, for the student athletic teams of state educational institutions to contest with other athletic teams inside or outside the state.
>
> "All money derived from such fees and under such contracts shall be used to defray the cost of maintaining the athletic department and athletic program of such institutions."

It is contended by relator that the payment of hospital and medical expenses of injured students from the athletic fund is incidental to "maintaining the athletic de-

partment and athletic program" of West Virginia University, and other state educational institutions; and that the foregoing statute has been interpreted by a long-standing administrative interpretation as shown by the approval of the state auditor of requisitions on such fund for the payment of claims such as are involved here.

This Court in the case of *State* v. *Davis,* 62 W. Va. 500, pt. 4 syl., 60 S. E. 584, held: "A contemporary exposition of a statute, uncertain in its meaning, recognized and acquiesced in, for a long period of time, by the officers charged with the duty of enforcing it, the courts, the Legislature and the people, will be adopted unless it is manifestly wrong." See also *State ex rel. Brandon* v. *Board of Control,* 84 W. Va. 417, pt. 2 syl., 100 S. E. 215.

But this case involves more than an administrative interpretation of Section 2, Article 1-a, Chapter 83, Acts of the Legislature, Regular Session, 1943. It also involves the question whether the statute, if interpreted to permit the payment of the instant claim, is unconstitutional within the prohibition of Article X, Section 6, of the Constitution of this State, which reads: "The credit of the State shall not be granted to, or in aid of any county, city, township, corporation or person; nor shall the State ever assume, or become responsible for the debts or liabilities of any county, city, township, corporation or person; nor shall the State ever hereafter become a joint owner, or stockholder in any company or association in this State or elsewhere, formed for any purpose whatever."

In determining the constitutionality of the instant statute, we, of course, must be guided by the cardinal rule of constitutional law, that an act of the Legislature cannot be declared void as in contravention of the Constitution except where such act clearly and plainly violates a provision thereof. *Harbert* v. *Harrison County Court,* 129 W. Va. 54, 39 S. E. 2d 177; 4 M. J., Constitutional Law, Sections 16 and 33. In resolving a constitutional question such as is involved in this case, there are several governing postulates. In the first place, we think that, though

the athletic fund consists solely of moneys earned and derived from the activities of the athletic department of the university which are deposited in the state treasury in a special fund, they are, by statutory implication, public moneys. Chapter 12 of the Official Code is denominated as dealing with "Public Moneys and Securities." Code, 12-2-2, as amended by Chapter 28, Acts of the Legislature, Regular Session, 1931, and Chapter 64, Acts of the Legislature, Regular Session, 1941, provides in subsection (d) thereof that "All fees and funds collected at state educational institutions for student activities;" and in subsection (j) thereof that "All moneys collected or received under any act of the legislature providing that funds collected or received thereunder shall be used for specific purposes", shall be paid into the state treasury, in the same manner as money is directed in said Section 2 to be paid into the state treasury as a part of the general revenue fund of the State; but it "shall be carried in separate accounts to be used and expended only for the purposes for which the same are authorized to be collected by law." Authorities: *State Bank of Commerce of Brockport* v. *Stone*, 258 N. Y. S. 717, 144 Misc. 393; *Texas Pharmaceutical Assn.* v. *Dooley* (Tex. Civ. App.), 90 S. W. 2d 328, 330.

By legislative fiat, the board of governors of the university is a public and governmental body and an arm of the State government. Code, Chapter 18, Article 11, Section 1, as amended and reenacted by Chapter 73, Acts of the Legislature, 1947, provides that "The business and educational affairs of the university shall be under the control, supervision and management of the board of governors, which shall be a corporation, and as such may contract and be contracted with, * * *." Chapter 89, Acts of the Legislature, 1947, amending Code, 18-11, by adding a new section to be designated as section one-a provides that "The control of the financial, business and all other affairs of the West Virginia university and of Potomac state school is hereby transferred from the state board of control to the board of governors. * * *" This section pro-

vides that the board of governors shall "in respect to the control, management and property of such institutions, have the same rights and powers and shall perform the same duties as were heretofore exercised or performed by the state board of control." In addition this section provides that the title to all property of the two named institutions is transferred to and vested in the board of governors.

We must ascertain, first, whether the provisions of said Section 2, Article 1-a, of the statute under appraisment, are broad enough to embrace the instant claims, and, second, whether the proposed expenditure in payment of these claims is for a public purpose and, therefore, not in contravention of Article X, Section 6 of the Constitution. In this regard we are alerted to the fact that this case does not involve a legislative finding of a moral obligation as existed in *Glover* v. *Sims, Auditor,* 121 W. Va. 407, 3 S. E. 2d 612. That case, however, is properly cited by counsel for relator on the question that mandamus is the proper remedy to require the discharge by a public officer of a nondiscretionary duty. The case likewise is properly cited to support the proposition that the athletic activities of the university are a part of the system of public education, and, therefore, is money expended in furtherance thereof for a public purpose. In the *Glover* case at page 411, this Court said: "* * * No one can successfully assert that a proper athletic program is not appropriate to a great educational institution. The physical welfare of young men and women cannot with propriety be ignored. Education is a proper function of state government and includes appropriate physical development as well as mental and moral. Granting that mistakes may have been made throughout the land in over-emphasis of inter-collegiate athletic activities, such fact can in no degree overshadow the wholesome importance of properly regulated and directed inter-collegiate and intra-mural athletic programs. The thousands of West Virginia boys and girls who through the years become students at the West Virginia University have better opportunity for well-

rounded education by reason of the stadium's being on the campus. * * *"

In *State ex rel. The West Virginia Board of Aeronautics* v. *Sims, Auditor,* 129 W. Va. 694, 41 S. E. 2d 506; *Kenny, Director, etc.* v. *County Court of Webster County,* 124 W. Va. 519, 21 S. E. 2d 385, as well as in the *Glover* case, this Court held that the State or a governmental agency thereof may contract for payment of expenditures for public purposes, and such expenditures are neither gratuities nor in payment of private claims within the meaning of Section 6, Article X, of the Constitution of this State. In the *Glover* case, this Court, though dealing with a moral obligation, said that "The relator's claim arose as an incidental expense of the athletic department in the administration of the affairs under its supervision." In the instant case, Section 2 under appraisement expressly provides that "All money derived from such fees and under such contracts [meaning admission fees, both compulsory and voluntary, and money received as guarantees from other institutions inside or outside the State] *shall be used to defray the cost of maintaining the athletic department and athletic program of such institutions.*" (Italics supplied). We think that the instant claims represent a part of the cost of maintaining the athletic department and the athletic program of the university. True, there is no express, specific authority contained in the Act authorizing the payment of claims such as we now have under consideration; but the statute contains no specific, express authority for the purchase of athletic uniforms or equipment. If specific, express authority were required for the payment of any money out of this fund, the athletic department of the university could not purchase athletic uniforms or equipment for its teams; it could not pay for the printing of tickets and programs; it could not pay the travelling expenses of its teams and coaches to distant playing fields and the hotel or other expenses incident to athletic contests outside the university stadium. We are impelled to the position that the payment of the instant

claims should not fail because there is no specific, express legislative authority for the payment thereof.

This leaves us with the sole question whether the payment of hospital and medical services for athletes injured in athletic contests, in which the public educational institutions of this State, including the university, engage, are a part of the cost "of maintaining the athletic department and athletic program" of these institutions.

This record, as heretofore indicated, does not disclose any holding out to students at the university engaging in athletics that hospital and medical expenses rendered necessary as a result of injuries incurred in athletic contests will be paid out of the athletic fund; nor does this record disclose that the athletic director, acting through the board of governors, has entered into any general contract with any hospital or physician, or a group thereof for the rendering of hospital and medical services in all future cases of injuries received by members of the student body of the university in athletic activities. It does disclose, however, a custom engaged in, not only at the university, but at many other educational institutions, to take care of their injured athletes. Bearing in mind that there is, after all is said and done, a wide discretion in the board of governors of the university and the athletic director thereof in the maintenance of the athletic program of the university, we do not say that in every future case the athletic fund should be drawn on to take care of injuries. We believe, however, that the athletic department, as well as the board of governors, in the exercise of the wide and sound discretion residing in them, which is necessarily exercised in the expenditure of money for the payment of athletic uniforms, the travelling expenses of teams, the payment of guarantees, and other expenses incidental and necessary to every athletic contest in which the university engages, has not exceeded its powers in the instant case. In so holding, we do not intend to be understood to say that the athletic director or board of governors would be justified in expending money for rehabilitation in the case of permanent injuries or for the pay-

ment of compensation to an injured athlete, or any beneficiary, for loss or damage resulting from injuries incurred in an athletic contest.

If the fund is not available for the payment of treatment of injuries incurred by members of the student bodies at public educational institutions who are injured in athletic contests, the burden of such payment in most cases will necessarily fall upon the parent, parents or guardian of the injured student. Such a situation might deter many parents or other persons having authority over prospective students, who desire to engage in athletic activities, from sending such person to an educational institution within the State where hospital and medical treatment are not provided by the State.

Collegiate athletic activities, especially in the realm of football, in the opinion of many thoughtful alumni and supporters of the university, are a great asset in maintaining a high caliber student body, and serve as an aid in the public relations of the university and every educational institution of higher learning. So we think that, under a fair appraisal of the statute in question, bearing in mind its wholesome purposes, its provisions are broad enough to authorize the payment of the instant claims, and, applying the rule that we should not declare the Act unconstitutional as applied to these claims, unless the unconstitutionality of the statute is clear, we hold that it is proper for the respondent auditor to issue his warrants, pursuant to the requisition for the payment of these claims; that he has no discretion in the matter; and that being a public officer charged with a mandatory duty in the premises, the writ prayed for is awarded.

*Writ awarded.*