580 S.E.2d 869

**STATE of West Virginia ex rel. WEST VIRGINIA CITIZENS ACTION GROUP, an Incorporated Association of State Citizens and Taxpayers, Petitioner Below, Appellant,**

v.

**WEST VIRGINIA ECONOMIC DEVELOPMENT GRANT COMMITTEE; City of Wheeling, A Municipal Corporation; and Century Equities—Wheeling Victorian Outlet Mall, Inc., A Private Corporation, Respondents Below, Appellees.**

**Kanawha County Commission, Intervenor.**

**No. 31125.**

Supreme Court of Appeals of West Virginia.

Submitted March 11, 2003.

Decided May 16, 2003.

Larry L. Harless, Cottageville, for the Appellant.

Darrell V. McGraw, Jr., Attorney General, Katherine A. Schultz, Senior Deputy Attorney General, Stephen Stockton, Senior Assistant Attorney General, Jennifer Lea Stollings, Assistant Attorney General, Charleston, for the Appellees.

G. Nicholas Casey, Richard L. Gottlieb, Webster J. Arceneaux, III, Lewis Glasser Casey & Rollins, PLLC, Charleston, for the Intervenor, Kanawha County Commission.

Rosemary J. Humway–Warmuth, Joanna I. Tabit, Steptoe & Johnson, PLLC, Wheeling, for the City of Wheeling, Amicus Curiae.

Robert M. Bastress, Morgantown, for American Civil Liberties Union of West Virginia, Amicus Curiae.

Vincent Trivelli, Stuart Calwell, Law Offices of Stuart Calwell, PLLC, Charleston, for The Affiliated Construction Trades Foundation, Amicus Curiae.

Webster J. Arceneaux, III, Richard L. Gottlieb, Lewis, Glasser, Casey & Rollins, PLLC, for Marshall University Research Corporation; Our Jobs, Our Children, Our Future, Inc. d/b/a The Huntington Area Development Council; Tri–State Transit Authority and Metropolitan Huntington, LLC; Advantage Valley Partners, LLC; Putnam County Development Authority; and Putnam County Commission, Amicus Curiae.

ALBRIGHT, Justice.

The West Virginia Citizen Action Group [1] (hereinafter referred to as "CAG") appeals from the January 21, 2003, order of the Circuit Court of Kanawha County upholding the constitutionality of portions of West Virginia Code § 29–22–18a(d)(3) (Supp.2002), specifically as it pertains to the manner in which the members of the Appellee West Virginia Economic Grant Committee [2] (hereinafter referred to as the "Grant Committee" or the "Committee") are appointed and the process by which the Grant Committee selects and approves grant applicants. The challenged legislation involves a mechanism previously approved by this Court [3] in the context of school bonds whereby revenue bonds are issued, without a vote of the state's citizenry, and repaid from an account within the West Virginia Lottery Fund designated as the "state excess lottery revenue fund." [4] While no such bonds have been issued due to the litigation at hand, the bonds contemplated by the subject legislation would be dedicated to a host of projects chosen by the Grant Committee for the express objective of "advanc[ing] the business prosperity of this state and the economic welfare of the citizens of this state." [5]

I.  **Statutory and Procedural Background**

At the center of this dispute is the statutory method for selecting the membership of the Grant Committee. The nine-person committee is comprised of the following individuals:

the governor, or his or her designee, the secretary of the department of tax and revenue, the executive director of the West Virginia development office, three persons appointed by the governor from a list of five names submitted by the president of the West Virginia senate, and three persons appointed by the governor from a list of five names submitted to the governor by the speaker of the West Virginia house of delegates.

W.Va.Code § 29–22–18a(d)(3). The involvement of the Legislature in identifying the list of potential committee members has sparked weighty challenges to this statute based on concerns rooted in the separation of powers provision of our state constitution. [6]

Pursuant to this statutory authorization, such a Grant Committee was selected and at its first meeting, the committee adopted a draft procedural rule delineating the criteria for considering the various submitted grant applications. The four-part standard upon which the projects were to be evaluated was: (1) the ability of the project to leverage other sources of financing; (2) job creation and retention; (3) promotion of economic development in the region; and (4) whether the project is in the public interest of the State. The enabling legislation provides that once the Grant Committee selects and certifies a list of projects, the list is not subject to alteration other than by legislative enactment. See W.Va.Code § 29–22–18a(d)(3).

During various meetings, the Grant Committee considered 197 submitted projects. Public hearings [7] were held, as required by statute, in connection with the grant applications. See W.Va.Code § 29–22–18a(d)(3). While all 197 projects were reviewed during the period between April 25, 2002, and July 31, 2002, the Grant Committee approved the first grant recipient—the Wheeling Project [8] —on May 8, 2002. The Grant Committee conditionally agreed to provide the Wheeling Project with seventy million dollars, provided that certain terms outlined in a May 13, 2002,

1.  This group describes themselves as an incorporated association of state citizens and taxpayers.

2.  Also named as Appellees in this action are the City of Wheeling and Century–Equities–Wheeling Victorian Outlet Mall, Inc. The Kanawha County Commission has intervened in this matter.

3.  See State ex rel. Marockie v. Wagoner, 191 W.Va. 458, 446 S.E.2d 680 (1994).

4.  W.Va.Code § 29–22–18a.

5.  W.Va.Code § 29–22–18a(d).

6.  W.Va. Const. art. V, § 1.

7.  Public hearings in connection with the 197 projects were held on April 25, 2002; September 4, 2002; and September 5, 2002.

8.  This project involves the renovation of various downtown structures in Wheeling for the purpose of building a Victorian-themed outlet retail center.

award letter were met.[9] An additional thirty-five projects were approved by the Grant Committee at two meetings held on October 17, 2002, and November 12, 2002.

CAG filed a petition with this Court on September 3, 2002, seeking writs of mandamus and prohibition in connection with the Wheeling Project's approval and other activities undertaken by the Grant Committee.[10] This Court issued a rule returnable to the Circuit Court of Kanawha County to permit development of a record and to address the issues raised in an expeditious manner.[11] Following various hearings on this matter, the circuit court issued its memorandum order on January 21, 2003, through which the trial court ruled that the Grant Committee's singular consideration and approval of the Wheeling Project resulted in a flawed certification of that project for failure to meet an implied statutory requirement that multiple grant applications should be comparatively evaluated.[12] The circuit court found no constitutional infirmities with regard to the appointment process for the Grant Committee or the legislation authorizing the Committee's actions.

CAG appeals from the decision of the circuit court, seeking a ruling of unconstitutionality with regard to both West Virginia Code § 29–22–18a(d)(3) and the actions undertaken by the Grant Committee pursuant to such statutory authorization. The Appellant asserts error on various constitutional grounds, including separation of powers; improper delegation of legislative power; usurpation of the governor's appointment power; violation of the debt clause; and improper extension of the state's credit. Upon our review of the matter, we conclude that the appointment mechanism for the Grant Committee violates the separation of powers provision of the state constitution,[13] and the appointments provision of the state constitution.[14] Due to the insufficiency of the statutory guidance provided for the Grant Committee's use in selecting recipients for state funds, we determine that the Legislature has wrongfully delegated its powers in violation of the state constitution.[15] With regard to the statutory challenges concerning alleged violations of the constitutional provisions governing debt and credit, and the statute's lack of a valid public purpose, we find no constitutional infirmities.

Although we have determined that West Virginia Code § 29–22–18a(d)(3) contains several constitutional deficiencies, we wish to make clear first, that we find no constitutional infirmities with regard to the overall legislative plan for seeking economic development with the aid of the Grant Committee. Second, and perhaps most importantly, we wish to point out that the Legislature, in our view, may easily correct the defects noted in this opinion and, further, that the necessary statutory amendments can be effected in a timely manner, should the Legislature decide to amend those limited provisions which we have determined to be constitutionally deficient. While we are mindful of the implementational delays with regard to previously approved projects, this Court's obligation to uphold the Constitution of this state compelled the result reached in this case.

## II. Standard of Review

■ Our standard of review is *de novo*, given the questions of law raised that involve

---

9. The reason given for the expedited approval of this project was the fact that significant work had been completed with respect to the planning of this project in comparison to the other projects.

10. The petition was later amended to include challenges to the additional thirty-five projects approved by the Grant Committee on October 17, 2002, and November 12, 2002.

11. Judge Charles E. King, Jr., held the first hearing in this matter on October 2, 2002.

12. The Wheeling Project was the first project approved by the Grant Committee; the lower court ruled that this issue of statutory non-compliance could be remedied by requiring the committee to reconvene and re-vote on whether grant moneys should be extended for this project in view of the subsequent grant applications the committee considered. During oral argument of this case, counsel for the City of Wheeling conceded this point, indicating its decision not to challenge the lower court's ruling on this matter.

13. W.Va. Const. art. V, § 1.

14. W.Va. Const. art. VII, § 8.

15. W.Va. Const. art. VI, § 1.

statutory application and the additional issues presented concerning the constitutionality of the enactment at issue. *See Phillip Leon M. v. Greenbrier County Bd. of Educ.*, 199 W.Va. 400, 404, 484 S.E.2d 909, 913 (1996) (stating that "[b]ecause interpretations of the West Virginia Constitution, along with interpretations of statutes and rules, are primarily questions of law, we apply a *de novo* review"); Syl. Pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995) ("Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review."). Accordingly, our review of this matter is plenary.

## III. Discussion

### A. Separation of Powers

CAG, along with the American Civil Liberties Union of West Virginia (hereinafter referred to as the "ACLU"), as amicus curiae, strenuously assert that the appointment mechanism contained within the subject statute runs afoul of this state's separation of powers provision. That provision mandates that:

The legislative, executive and judicial departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others; nor shall any person exercise the powers of more than one of them at the same time, except that justices of the peace shall be eligible to the legislature.

W.Va. Const. art. V, § 1. By creating the list from which the Grant Committee members are chosen, CAG argues that the Legislature, acting through its house speaker and senate president, has crossed a clearly demarcated line intended to separate the executive branch from the legislative branch of state government.

Interwoven with its separation of powers argument is the corollary contention that the provisions of West Virginia Code § 29–22–18a(d)(3) violate the governor's constitutionally delineated powers of appointment. *See* W.Va. Const. art. VII, § 8.[16] Based on the legislative involvement in the committee selection process, CAG maintains that the subject legislation improperly authorizes the Legislature to invade the province of the executive branch of government.

### 1. Fundamental Construct

As we observed in *State v. Huber*, 129 W.Va. 198, 40 S.E.2d 11 (1946), in discussing the doctrine of separation of powers: "No theory of government has been more loudly acclaimed." *Id.* at 209, 40 S.E.2d at 18. This fundamental [17] construct of our system of government has been the subject of countless commentaries:

'This separation is deemed to be of the greatest importance; absolutely essential to the existence of a just and free government. This is not, however, such a separation as to make these departments wholly independent; but only so that one department shall not exercise the power nor perform the functions of another. They are mutually dependent, and could not subsist without the aid and co-operation of each other. Under the constitutions, the legislature is empowered to make laws; it has that power exclusively; the executive has the power to carry them by all executive acts into effect, and the judiciary has the exclusive power to expound them as the law of the land between suitors in the administration of justice. The legislature can do no executive acts, but it can legislate to regulate the executive office, pre-

---

**16.** The state constitution provides that:
The governor shall nominate, and by and with the advice and consent of the senate, (a majority of all the senators elected concurring by yeas and nays), appoint all officers whose offices are established by this Constitution, or shall be created by law, and whose appointment or election is not otherwise provided for; and no such officers shall be appointed or elected by the legislature.
W.Va. Const. art. VII, § 8.

**17.** In *Hodges v. Public Service Commission*, 110 W.Va. 649, 159 S.E. 834 (1931), we observed that the separation of powers provision was "the very first resolution passed in the convention which framed our national constitution" and commented further that "Story refers to this division as 'a fundamental proposition,' Cooley as a 'fundamental principle,' and Ordronaux as 'this fundamental truth.'" *Id.* at 652–53, 159 S.E. at 836 (citing Const. Leg. 344).

scribe laws to the executive which that department, and every grade of its officers, must obey. The legislature cannot decide cases, but it can pass laws which will furnish the basis of decisions, and the courts are bound to obey them. The functions of each branch are as distinct as the stomach and lungs in our bodies. They are intended to co-operate; not to be antagonistic; they are functions in the same system; when each functionary does its appropriate work no interference or conflict is possible.'

*State v. Harden,* 62 W.Va. 313, 371–72, 58 S.E. 715, 739 (1907) (quoting Lewis' Suth. Stat. Cons. § 2).

The United States Supreme Court in *O'Donoghue v. United States,* 289 U.S. 516, 53 S.Ct. 740, 77 L.Ed. 1356 (1933), articulated that the objective of separating the powers of government into three distinct branches was "to preclude a commingling of these essentially different powers of government in the same hands." *Id.* at 530, 53 S.Ct. 740. Expounding further on our tripartite form of government, the high Court reasoned:

If it be important thus to separate the several departments of government and restrict them to the exercise of their appointed powers, it follows, as a logical corollary, equally important, that each department should be kept completely independent of the others—independent not in the sense that they shall not cooperate to the common end of carrying into effect the purposes of the Constitution, but in the sense that the acts of each shall never be controlled by, or subjected, directly or indirectly, to, the coercive influence of either of the other departments. James Wilson, one of the framers of the Constitution and a justice of this court, in one of his law lectures said that the independence of each department required that its proceedings "should be free from the remotest influence, direct or indirect, of either of the other two powers." 1 Andrews, The Works of James Wilson (1896), Vol. 1, p. 367. And the importance of such independence was similarly recognized by Mr. Justice Story when he said that in reference to each other, nei-

ther of the departments "ought to possess, directly or indirectly, an overruling influence in the administration of their respective powers." 1 Story on the Constitution, 4th ed. s 530. To the same effect, The Federalist (Madison) No. 48. And see *Massachusetts v. Mellon,* 262 U.S. 447, 488 [43 S.Ct. 597, 67 L.Ed. 1078 (1923)].

289 U.S. at 530–31, 53 S.Ct. 740; *accord Kilbourn v. Thompson,* 103 U.S. 168, 191, 26 L.Ed. 377 (1880) ("It is ... essential to the successful working of this system that the persons intrusted with power in any one of these branches shall not be permitted to encroach upon the powers confided to the others, but that each shall by the law of its creation be limited to the exercise of the powers appropriate to its own department and no other.").

■ Addressing this state's separation of powers provision, we recognized in syllabus point one of *State ex rel. Barker v. Manchin,* 167 W.Va. 155, 279 S.E.2d 622 (1981), that

Article V, section 1 of the Constitution of West Virginia which prohibits any one department of our state government from exercising the powers of the others, is not merely a suggestion; it is part of the fundamental law of our State and, as such, it must be strictly construed and closely followed.

As we acknowledged in *Sims v. Fisher,* 125 W.Va. 512, 25 S.E.2d 216 (1943), this Court has expressed "a policy of strong adherence to the several constitutional provisions relating to the separation of powers." *Id.* at 524, 25 S.E.2d at 222.

### 2. Legislative vs. Executive Powers

■ In *Manchin,* we outlined the division of powers and responsibilities among the three branches of state government: "Generally speaking, the Legislature enacts the law, the Governor and the various agencies of the executive implement the law, and the courts interpret the law, adjudicating individual disputes arising thereunder." 167 W.Va. at 168, 279 S.E.2d at 631 (citing W.Va. Const. art. VI, § 1; art. VII, § 5; art. VIII, § 1); *see also Springer v. Govt. of Philippine Islands,* 277 U.S. 189, 202, 48 S.Ct. 480, 72 L.Ed. 845

(1928) ("Legislative power, as distinguished from executive power, is the authority to make laws, but not to enforce them or appoint the agents charged with the duty of such enforcement. The latter are executive functions."). There can be no question that the Grant Committee falls within the ambit of the executive branch of government as that committee is charged with the task of implementing specific legislation. *See* W.Va. Code § 29–22–18a(d)(3).

Similarly beyond dispute is the fact that the Legislature can play no role in the implementation of the laws it enacts. This Court's decision in *Manchin* squarely confronted the issue of legislative encroachment into powers reserved for the executive branch. The Legislature had sought to create for itself a "mechanism for legislative review of executive action" by conferring on a legislative committee the power to veto proposed agency rules. 167 W.Va. at 173, 279 S.E.2d at 633. In striking this mechanism as violative of the separation of powers, we observed that this " 'extra-legislative control device' [wrongly] . . . permits the Legislature to act as something other than a legislative body to control the actions of the other branches." *Id.* at 173, 279 S.E.2d at 633; *accord State ex rel. Meadows v. Hechler*, 195 W.Va. 11, 462 S.E.2d 586 (1995) (finding separation of powers violation in legislation that sanctioned veto of agency regulations from committee inaction).

Underlying any encroachment of power by one branch of government is the paramount concern that such action will "impermissibly foster[ ] . . . dominance and expansion of power:" [18] *Manchin*, 167 W.Va. at 177, 279 S.E.2d at 635–36. Applying that concern to the facts presented in *Manchin*, we observed that: "In effect, the executive exercise of discretion is replaced by committee exercise of discretion, increasing the role of the legislature at the expense of the execu-

tive." 167 W.Va. at 177, 279 S.E.2d at 636. In addition to upsetting the balance of powers between the branches, we identified the risk that maximization of self-interest could result where the normal limits on discretionary power are no longer in place due to legislative involvement in an executive function. *Id.* at 178, 279 S.E.2d at 636.

### 3. Legislative Role in Implementing Subject Legislation

CAG argues that the Legislature, through its enactment of West Virginia Code § 29–22–18a, has put in place a mechanism by which it retains some control over the process of implementing the legislation under discussion. By virtue of its active role in choosing the slate of prospective Grant Committee members, CAG contends that the Legislature retains power to control, in either direct or indirect fashion, the actions of a majority of the Committee members. Notwithstanding the governor's actual appointment of the Committee members, CAG maintains that the constitutional impediments resulting from the statutory appointment process remain.

To support its position, CAG relies primarily on authority that bans various state Legislatures from appointing *legislative members* to serve on executive agencies, boards, or commissions. *See Greer v. State of Georgia*, 233 Ga. 667, 212 S.E.2d 836 (1975) (declaring legislation unconstitutional that named certain legislators to governing body of World Congress Authority); *Alexander v. State of Miss. ex rel. Allain*, 441 So.2d 1329 (Miss.1983) (striking various statutes naming legislative members to executive offices including Board of Economic Development); *State of N.C. ex rel. Wallace v. Bone*, 304 N.C. 591, 286 S.E.2d 79 (1982) (striking legislation that authorized four legislators to serve on legislatively created Environmental Management Commission as violative of sep-

---

18. In *Hechler*, we quoted Justice Brandeis' famous quotation on the concern underlying the establishment of a tripartite form of government:

'The doctrine of the separation of powers was adopted by the Convention of 1787, not to promote efficiency but to preclude the exercise of arbitrary power. The purpose was, not to avoid friction, but, by means of inevitable fric-

tion incident to the distribution of governmental powers among the three departments, to save the people from autocracy.'

195 W.Va. at 14 n. 12, 462 S.E.2d at 589 n. 12 (quoting *Myers v. United States*, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926) (Brandeis, J., dissenting)).

aration of powers); *State ex rel. State Bldg. Commn. v. Bailey*, 151 W.Va. 79, 150 S.E.2d 449 (1966) (finding separation of powers violation in legislation naming four legislative officers to State Building Commission); *see also Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise*, 501 U.S. 252, 111 S.Ct. 2298, 115 L.Ed.2d 236 (1991) (striking legislation permitting Congress to place its members on board of review having veto power over airport authority's decisions).

While the law is clear that legislators themselves cannot hold positions on executive agencies, boards, or commissions, the law is less clear as to what role a state legislature can play in compiling a list of prospective appointees for an executive appointment. CAG relies heavily on the decision reached by the Kentucky Supreme Court in *Legislative Research Commission ex rel. Prather v. Brown*, 664 S.W.2d 907 (Ky.1984). Among the holdings in *Brown* was a ruling finding several statutes unconstitutional on separation of powers grounds that directed the governor to make appointments for executive positions from lists submitted by the Legislative Research Commission, a small group of office-holding legislators. The Kentucky Supreme Court concluded that "[t]he General Assembly has attempted to do indirectly what it cannot do directly." *Id.* at 923–24. CAG contends that the *Brown* decision is apposite and that this Court should follow the result reached in that case.

The Grant Committee rejects *Brown* as analogous authority, arguing that a separation of powers violation does not occur in the instant case based on the simple fact that the governor, despite a legislatively prepared slate of prospective appointees, retains and exercises the constitutional right of appointment. Focusing on the fact that the governor chooses from the names submitted to him by the house speaker and senate president and emphasizing that the governor has the implied right to reject each name on a submitted list and to continue to do so until a list of suitable names appears, the Grant Committee maintains that the statutory appointment process does not run afoul of the separation of powers provision.

In its attempt to distinguish *Brown* from the case *sub judice*, the Grant Committee states that the Kentucky governor brought the lawsuit challenging the various statutes at issue in that case; notes that the decision was issued in a "highly charged" "political climate," [19] and suggests that the precedential value of that decision has been called into doubt based on recent decisions issued by that same court. Citing *Prater v. Commonwealth of Kentucky*, 82 S.W.3d 898 (Ky. 2002), the Grant Committee contends that, under a legal scenario similar to *Brown*, the Kentucky Supreme Court concluded that the "[l]egislature has not attempted to appoint administrative officers, nor has it completely denied the appointive function of the Executive." [20] *Id.* at 909. The Grant Committee's

**19.** While the Legislature did advocate in *Brown* that the Kentucky Supreme Court adopt a " 'liberal' construction of the Kentucky constitutional provisions creating the separation of powers doctrine," and sought an expansive declaration of its power based on the language of a prior holding of the Kentucky Supreme Court, the decision reached by the Court in *Brown* is clearly not subject to scrutiny based on an alleged power struggle between the executive and legislative branches. 664 S.W.2d at 909–10, 913. In *Brown*, the court reviewed the history of Kentucky's constitutional provisions addressing the separation of powers doctrine and thoroughly considered the foundations of our country's tripartite form of government before outright rejecting the legislature's suggestion that the doctrine of separation of powers be weakened:

We should not abandon the philosophical principles that were incorporated by the fram-

ers of our present constitution. The purpose of the separation of powers doctrine is uncontroverted. The precedents established by this court have been uniform in retaining the goals set by the framers. The separation of powers doctrine is set in the concrete of history and legal precedent. We will not overrule those cases and we will not, by the fiat of judicial legislation, change the clear and imperative meaning of our constitution. Such action is within the sole province of the voters of this Commonwealth.

*Id.* at 914.

**20.** The Grant Committee wrongly attributes this quote to the *Prater* case, when its actual source is *Elrod v. Willis*, 305 Ky. 225, 203 S.W.2d 18 (1947), and uses this quotation without acknowledging the distinction between the facts at issue in *Elrod* (i.e., no legislative involvement in ap-

reliance on *Prater*, however, is not only misplaced but, upon careful reading, *Prater* clearly supports the position of CAG, rather than that of the Grant Committee.

In contrast to the issues presented in *Brown*, Prater did not involve separation of powers violations flowing from legislative involvement in the executive appointment process. Instead, the issue in *Prater* was whether a statute establishing a "prerelease probation program" impermissibly conferred the executive power of parole upon the judiciary, thus violating the state's separation of powers provisions. 82 S.W.3d at 898. After rejecting the argument that the "executive branch's 'participation' in the trial court's prerelease probation decision in the form of eligibility determinations" somehow served to eliminate the separation of powers issue being considered, the Kentucky appellate court referred, for analytical purposes, to its "prior case law addressing the constitutionality of legislative involvement in the executive's appointment authority." *Id.* at 907.

Distinguishing the situation presented in *Brown* where both direct and indirect legislative appointments were held unconstitutional, the court in *Prater* cited two decisions upholding gubernatorial appointment to administrative bodies "from lists of persons submitted by third parties with an interest in the composition of those bodies." *Id.* at 908. Significantly, neither of those two cases, *Kentucky Association of Realtors, Inc. v. Musselman*[21] and *Elrod v. Willis*,[22] involved the troubling and more serious issue of legislative involvement in the appointment process. Both of those cases concerned entities other than the state legislature submitting lists of prospective board members. When the legislature confines itself to the permissible function of establishing the parameters of executive appointment without injecting itself directly in the process, as the court in *Prater* explained, there is no encroachment upon the "exercise [of] the executive power of appointment." 82 S.W.3d at 909.

Crystalizing that it is the *legislative involvement in the appointment process* which

pointment process) and those at issue in this case.

prevents a challenged statutory method of appointment from passing constitutional muster, the court in *Prater* observed:

[T]here is a fundamental and critical difference between the statutes held constitutionally flawed in *LRC v. Brown* and the statutes proved as constitutionally valid in *Elrod v. Willis* . . . . The statutes in *LRC v. Brown* granted the General Assembly continuing power, either directly through its leadership or indirectly through the LRC (which we recognized was *not* an independent agency but an arm of the legislature), to require the Governor to appoint to specified commissions persons who were nominees of the legislature. This transgressed the mandate in Section 27 of our Kentucky Constitution that "each" department of government shall "be confined to a separate body of magistracy," and in Section 28 that "[n]o . . . persons, being of one of those departments, shall exercise any power properly belonging to either of the others." *But the statute presently in question, as in the Elrod . . . case[ ], gives the General Assembly no voice in the selection of committee members; its reach extends solely to providing a method of selection* with reasonable criteria to generate commission members qualified for the position *through participation of an organization,* the Kentucky Association of Realtors, *which is independent of legislative control.*

82 S.W.3d at 908 (quoting *Musselman,* 817 S.W.2d at 216–17) (emphasis supplied).

In seeking to bolster its position, the Grant Committee erroneously attributes a statement to *Prater* that, in actuality, emanates from *Elrod. See* 203 S.W.2d 18. *Elrod* involved a statute authorizing the Kentucky governor's appointment of individuals to the Disabled Ex–Servicemen's Board from a list submitted by the American Legion. The reason the Kentucky Supreme Court was able to declare in *Elrod* that the legislature had "not attempted to appoint administrative officers, nor has it completely denied the appointive function of the Executive" can be found in the very next sentence of that opin-

**21.** 817 S.W.2d 213 (Ky.1991).

**22.** 305 Ky. 225, 203 S.W.2d 18.

ion. 203 S.W.2d at 20. "It has simply limited the Governor's selection to a list of men named by an organization which is not affected by the limitation of section 27 [separation of powers]." *Id.* Rather than abandoning its ruling in *Brown* concerning the unconstitutionality of legislatively prepared lists for executive appointments,[23] the Court in *Prater* was merely clarifying that a separation of powers violation is *not* implicated when the list preparation at issue is not performed by legislators. *See* 82 S.W.3d at 908.

The West Virginia Legislature,[24] under authority of West Virginia Code § 29–22–18a(d)(3), played an active role in identifying which individuals should be appointed to the Grant Committee. Through its designation of these individuals for the governor's selection, the Legislature wrongly injected itself into the appointment process—a function indisputably reserved to the executive branch of government. The danger of this type of an encroachment is the possibility that such action could conceivably result in the "expansion of the legislative power beyond its constitutionally confined role." *Washington Airports Auth.*, 501 U.S. at 277, 111 S.Ct. 2298. While we do not wish to ascribe any improper assertion of control by the Legislature over the actions of the Grant Committee, we would be skirting our obligation to uphold the constitution of this state if we failed to recognize that the appointment mechanism established by the subject legislation does indeed set in place a device by which the Legislature may assert post-enactment control over executive branch decisions. *See Manchin*, 167 W.Va. at 173, 279 S.E.2d at 633.

■ In clear recognition of this Court's responsibility to enforce the constitutional constraints imposed upon the separate branches of government and in adherence to our longstanding practice of strictly construing the separation of powers provision, we hold that, due to the resulting encroachment on the executive power of appointment, the

provisions of West Virginia Code § 29–22–18a(d)(3) that direct the presiding officers of each house of the Legislature to submit a list of prospective candidates to the Governor for the chief executive's selection of certain members of the West Virginia Economic Grant Committee are in violation of the separation of powers provision found in article five, section one of the West Virginia Constitution.

### 4. Governor's Powers of Appointment

In addition to violating the separation of powers provision of this state's constitution, CAG maintains that the subject legislation violates the appointments provision of the constitution, which provides that:

> The governor shall nominate, and by and with the advice and consent of the senate, (a majority of all the senators elected concurring by yeas and nays), appoint all officers whose offices are established by this Constitution, or shall be created by law, and whose appointment or election is not otherwise provided for; and no such officers shall be appointed or elected by the legislature.

W.Va. Const. art. VII, § 8. Both the Grant Committee and the circuit court reason that the appointments clause is not implicated by the subject legislation, based on their conclusion that the Committee members are not officers of the state.

Finding the reasoning employed in *Craig v. O'Rear*, 199 Ky. 553, 251 S.W. 828 (1923), to be persuasive, the lower court determined that the Grant Committee members were not officers of the state. At issue in *Craig* was legislation that created an eight-person commission whose members were selected by legislative officers for the limited purpose of selecting sites for two schools. In addressing a separation of powers issue, the Court in *Craig* observed: "[P]ractically all of the courts hold that mere temporary agents appointed to perform a particular task, who

23. In 1991, the Kentucky Supreme Court emphatically stated: *"We do not now retreat from our decision in LRC v. Brown one iota."* *Musselman*, 817 S.W.2d at 216 (emphasis in original).

24. While the statute provides for the presiding officers of each house of the Legislature to submit a list of names to the governor for Committee membership purposes, we refer to the Legislature as a whole with regard to the Legislature's involvement in the appointment process.

serve without term and without pay, and whose functions cease when the purpose is accomplished, may be appointed by the Legislature itself, or in any manner that it may provide...." *Id.* at 831. Relying on these factors, the trial court and the Committee conclude that the Grant Committee members are merely temporary agents and not officers of the state. As support for this position, they cite to the fact that under the subject statute, as it pertains to the Grant Committee, there is no salary; no specified term of appointment; no bond posting requirement; and no oath-taking requirement.[25] *See* W.Va.Code § 29–22–18a(d)(3).

What both the trial court and the Committee overlook in characterizing the Grant Committee members as temporary agents is the discerning consideration of whether those members are cloaked with authority to exercise the sovereign power of the state.[26] In *State ex rel. Key v. Bond,* 94 W.Va. 255, 118 S.E. 276 (1923), we recognized that

> [a]s a general rule it may be stated that a position is a public office when it is created by law, with duties cast on the incumbent *which involve an exercise of some portion of the sovereign power and in the performance of which the public is concerned,* and which are continuing in their nature and not occasional or intermittent. But one who merely performs the duties required of him by persons employing him under an express or implied contract, though such persons themselves be public officers, and though the employment be in or about public work or business, is a mere employee.

*Id.* at 260, 118 S.E. at 279 (emphasis supplied).

■ By limiting its analysis to circumstances such as salary, appointment length, oath taking, and bond requirements, the lower court failed to fully analyze this issue. Two additional factors that we discussed in concluding that the chief clerk employed by the Secretary of State in *Bond* was not a public officer were the absence of job duties prescribed by law and the employee's lack of independent power or authority over the exercise of her job duties. 94 W.Va. at 260–61, 118 S.E. at 279. Despite the absence of certain indicia of public office, the Grant Committee members are clearly vested with authority to exercise independent judgment and discretion. The issuance of revenue bonds as a result of the Committee's actions illustrates the fact that the Grant Committee is acting on behalf of the state in performing its duties. Further evidence that the Committee has been given authority to make critical decisions invoking the sovereign power of the state is gleaned from the fact that once the Committee certifies its list identifying the selected projects, those projects are not subject to alteration. *See* W.Va.Code § 29–22–18a(d)(3). Given the independent judgment and discretion of the Committee combined with the cloak of finality that the Legislature has placed upon the actions of the Grant Committee, there can be no doubt that the Committee's decisions necessarily implicate an exercise of the sovereign power of the state. *See Hall v. Pizzino,* 164 W.Va. 331, 334, 263 S.E.2d 886, 887 (1980) (stating that county superintendent of schools " 'came within the definition of a public officer in that he was authorized to exercise some of the sovereign powers of the state' ") (quoting *County Court v. Nicely,* 121 W.Va. 767, 6 S.E.2d 485 (1939)).

■ In view of the fact that the Grant Committee members do have statutorily-prescribed job duties; their job description necessarily reposes the members with independent decisionmaking authority and discretion; and through the exercise of their job description the members are permitted to make financial decisions that consequently have an effect on the availability of both present and future state lottery funds, we are compelled to conclude that the Commit-

---

25. We note, however, that the committee members did take the oath of office that is required by our state constitution for both elected and appointed office holders. *See* W.Va. Const. art. IV, § 5.

26. In the *Craig* decision relied upon by the trial court, it was observed that "no expenditure of the state's money was involved" with regard to the decision making authority of the school commission. 251 S.W. at 832. Only private funds were involved in that case.

tee members are indeed officers of the state. To find otherwise, would be to ignore the realities of the decision-making power of the Grant Committee and the impact of its decisions on the financial resources of this state. Accordingly, we hold that the provisions of West Virginia Code § 29–22–18a(d)(3) that direct the Legislature's involvement in the appointment process of the members of the Grant Committee are in violation of the appointments provision found in article seven, section eight of the West Virginia Constitution.

### 5. Reconstitution of the Committee

Based on clear violations of both the separation of powers provision and the appointments provision, the Grant Committee will have to be reconstituted, assuming the Legislature wishes to pursue its stated plan of using the Grant Committee for the purpose of expending state moneys for economic development. Should the Legislature choose to amend the subject legislation to cure the defects, the Legislature should repose the duty of filling the six positions previously chosen [27] through the legislative submission process exclusively in the executive branch, with or without confirmation by the Senate, as the Legislature shall determine.[28] We suggest that the Grant Committee members should be required to take an oath of office and to post a bond. While separation of powers concerns prevent the direct involvement of the Legislature in the appointment process, we wish to make clear that individual legislators, including its constitutional officers, as well as any citizen of this state, may offer the appointing executive suggestions

regarding the Committee's membership without violating in any respect the constitutional prerogatives of the executive branch of government.

### B. Delegation of Legislative Power

### 1. Circuit Court's Ruling

CAG argues that the circuit court erred in determining that the Legislature's grant of authority to the Committee was not an unconstitutional delegation of its powers in violation of article six, section one of the state constitution.[29] Dispensing quickly with the fact that the Legislature had not delegated a pure legislative function to the Grant Committee,[30] the trial court correctly framed the issue in terms of whether the Legislature delegated authority to the Committee without adequate guidance or guidelines to accomplish the designated statutory objectives. In upholding the legislation against this challenge of unlawful delegation, the trial court examined three decisions of this Court against two opinions issued by foreign tribunals.

Looking first to *State ex rel. West Virginia Housing Development Fund v. Copenhaver*, 153 W.Va. 636, 171 S.E.2d 545 (1969), the trial court noted that this Court upheld a broad grant of discretion to the Housing Development Fund concerning discretionary determinations of who should receive loans designated for "persons and families of low and moderate income." After recognizing that " [t]he delegation by the legislature of broad discretionary powers to an administrative body, accompanied by fitting standards for their exercise, is not of itself unconstitu-

---

**27.** Should the appointing executive choose to do so, there is no bar to re-naming those same six individuals to the Grant Committee. This is because the separation of powers and appointment clause violations are implicated solely because of the method by which those individuals were initially placed on the Committee. Simply put, the "taint" of the appointment process does not attach to the individuals selected as committee members.

**28.** *See Blue v. Smith*, 69 W.Va. 761, 72 S.E. 1038 (1911).

**29.** This provision states that: "The legislative power shall be vested in a senate and house of delegates." W.Va. Const. art. VI, § 1.

**30.** *See State ex rel. Mountaineer Park, Inc. v. Polan*, 190 W.Va. 276, 438 S.E.2d 308 (1993) (holding Legislature's delegation of power to Lottery Commission to establish electronic video lottery unconstitutional); *see also State ex rel. W. Va. Hous. Dev. Fund v. Copenhaver*, 153 W.Va. 636, 650, 171 S.E.2d 545, 553 (1969) (explaining that " [p]urely legislative power, which can never be delegated, has been described as the authority to make a complete law-complete as to the time when it shall take effect and as to whom it shall be applicable-and to determine the expediency of its enactment' ") (quoting 16 Am. Jur.2d, *Constitutional Law* § 242, pp. 493–94).

tional,'" we rejected the constitutional challenge to the subject legislation. *Id.* at 649, 171 S.E.2d at 553 (quoting Syl. Pt. 8, *Chapman v. Huntington, W.Va., Hous. Auth.,* 121 W.Va. 319, 3 S.E.2d 502 (1939)). In explanation of our holding, we stated:

> The legislature enacted the law here in question and has not delegated to the Fund any purely legislative authority. It has, perhaps as a matter of absolute necessity, clothed the Fund with a power and duty, in a limited area, to exercise a degree of discretion or judgment in determining who are 'persons and families of low and moderate income.' *The legislature has not failed to set forth guidelines or standards to guide the Fund in the exercise of its judgment or discretion in this limited area.* We note that the phrase 'low and moderate income' is used conjunctively rather than disjunctively. By legislative definition 'persons and families of low and moderate income' are encompassed in a single definition embraced in Section 3(8).... [31]

153 W.Va. at 650, 171 S.E.2d at 553 (emphasis supplied and footnote added).

When the Housing Development Fund Act was amended in 1973, the Act was again challenged on grounds of improper legislative delegation. *See State ex rel. W.Va. Hous. Dev. Fund v. Waterhouse,* 158 W.Va. 196, 212 S.E.2d 724 (1974). Based on a new definition of persons qualifying for housing assistance, we were asked in *Waterhouse* to determine whether the Legislature had failed to provide proper guidance for identifying which per-

sons qualified for housing assistance.[32] Noting that "great leeway is allowed the legislature in setting forth guidelines or standards," we found the following definition of eligibility "adequate to guide the Housing Fund in its deliberations and [to] suppl[y] the necessary standards:" "'Persons who because of age or physical disability are found and determined by the housing development fund, by resolution, to require residential housing of a special location or design in order to provide them with sanitary, decent and safe residential housing.'" *Id.* at 213–14, 212 S.E.2d at 734 (quoting W.Va.Code § 31–18–3(3)(c) (1973)). In upholding the standards for eligibility against the claim of wrongful delegation, we observed: "The powers delegated by the legislature, not being purely legislative in nature but rather being discretionary authority to carry out the well defined purpose of the Act, do not constitute an improper delegation of powers." 158 W.Va. at 214, 212 S.E.2d at 734.

In the third West Virginia case that the trial court considered, *State ex rel. Marockie v. Wagoner (Wagoner II),* 191 W.Va. 458, 446 S.E.2d 680 (1994), we examined whether the Legislature set forth adequate standards in giving the school building authority discretion to issue bonds and to choose which projects should be funded. *Id.* at 469, 446 S.E.2d at 691. Likening the discretion at issue to that considered in *Copenhaver,* we held that "the legislature out of necessity gave the SBA certain discretionary powers and provided sufficient guidelines to guide the SBA in its exercise of discretion." *Id.*

---

**31.** That definition provided as follows:

'Persons and families of low and moderate income' means persons and families, irrespective of race, creed, national origin or sex, determined by the housing development fund to require such assistance as is made available by this article on account of personal or family income not sufficient to afford sanitary, decent and safe housing, and to be eligible or potentially eligible to occupy residential housing constructed and financed, wholly or in part, with federally insured construction loans, federally insured mortgages, federal mortgages or with other public or private assistance, and in making such determination the fund shall take into account the following: (a) The amount of the total income of such persons and families available for housing needs, (b) the size of the family, (c) the cost and condition of housing

facilities available, (d) the eligibility of such persons and families for federal housing assistance of any type predicated upon a low or moderate income basis, and (e) the ability of such persons and families to compete successfully in the normal housing market and to pay the amounts at which private enterprise is providing sanitary, decent and safe housing[.] 153 W.Va. at 650–51, 171 S.E.2d at 553–54 (quoting W.Va.Code § 31–18–3(14)).

**32.** As a result of amendments to the Housing Development Fund Act in 1973, those individuals entitled to funding were selected based on a definition of "eligible persons and families," rather than the previous standard of "persons and families of low and moderate income."

Without identifying a specific provision of the legislation at issue, West Virginia Code §§ 18–9D–1 *et seq.,* we found the necessary legislative guidance had been provided in the cumulative provisions of the subject statutes to reject a finding of wrongful delegation of legislative powers.[33]

The circuit court rejected the two cases relied upon by CAG as analogous authority, finding those decisions to be inapposite given the delegations of broad statutory authority extended in those decisions. *See Douglas v. Judge,* 174 Mont. 32, 568 P.2d 530 (1977); *In re Initiative Petition No. 332,* 776 P.2d 556 (Okla.1989). In *Douglas,* the Montana Supreme Court found constitutionally deficient a legislative standard that based the distribution of loan funds to farmers and ranchers "*for any worthwhile project* for the conservation, management, utilization, development, or preservation of the land, water, fish, wildlife, recreational and other renewable resources in the state." 568 P.2d at 534 (emphasis supplied). Observing that "the only limit on the power to loan money for a certain project is the Board of Natural Resources and Conservation's subjective determination of whether a project is worthwhile," the Court concluded that the statute at issue failed to comply with its previously stated test for judging "the sufficiency of guidelines laid down by legislative enactments." *Id.* at 534–35. Those guidelines included the following parameters:

'[I]t is essential that the Legislature shall fix some standard by which the officer or board to whom the power is delegated may be governed, and not left to be controlled by caprice.' "We agree with this statement of the law and go further by saying that the standard must not be so broad that the officer or board will have unascertainable limits within which to act."

*Id.* at 534 (quoting *Bacus v. Lake County,* 138 Mont. 69, 354 P.2d 1056, 1062 (1960) and *State v. Stark,* 100 Mont. 365, 52 P.2d 890, 892 (1935)).

At issue in the Oklahoma decision of *In re Initiative* was proposed legislation that gave the Lottery Commission "total discretion to transfer funds to the 'proper state accounts' to benefit … broad public purpose categories." 776 P.2d at 557. Other than identifying the public purposes in general fashion as " 'education, economic development and job creation, programs for the elderly, the handicapped and the needy,' " "there was no legislative specification as to which agencies and which programs specifically would benefit and to what extent." *Id.* Concluding that the subject legislation constituted "fiscal policy making in its most basic form," the Court struck the legislation as being a wrongful delegation of legislative function. *Id.*

In determining that the West Virginia Legislature had set forth sufficient guidelines to withstand a constitutional challenge on wrongful delegation grounds, the trial court looked to the statement of purpose provided in the statute:

The Legislature finds and declares that in order to attract new business, commerce and industry to this state, to retain existing business and industry providing the citizens of this state with economic security and to advance the business prosperity of this state and the economic welfare of the citizens of this state, it is necessary to provide public financial support for constructing, equipping, improving and maintaining economic development projects, capital improvement projects and infrastructure which promote economic development in this state.

W.Va.Code § 29–22–18a(d).

Based on this statutory language, the trial court found that the Grant Committee "selects the recipients of public monies based on statutory criteria," while acknowledging that those "recipients are chosen on the basis of somewhat broad statutory prescriptions." Likening the statutory grant of discretion as similar to that at issue in *Wagoner II,* the

---

**33.** While the circuit court suggests that the legislative guidance that we found sufficient in *Wagoner II* was limited to subsection (a) of West Virginia Code § 18–9D–15, we did not so limit our holding on that issue. The entirety of the Act, as well as the numerous detailed provisions set forth in West Virginia Code § 18–9D–15 with regard to distribution of funds, were relied upon in rejecting the wrongful delegation of powers challenge in Wagoner II. *See* 191 W.Va. at 469, 446 S.E.2d at 691.

circuit court concluded that the statutory guidelines were "not so broad as to constitute unbridled discretion." Noting additionally that the four-pronged criteria adopted by the Grant Committee appear "directed toward determining whether or not a project will contribute to economic development," the trial court found that the evaluation criteria "constitute[d] a valid exercise of its discretion."

## 2. Lack of Adequate Statutory Guidance

■ As we announced in syllabus point three of *Quesenberry v. Estep*, 142 W.Va. 426, 95 S.E.2d 832 (1956):

As a general rule the Legislature, in delegating discretionary power to an administrative agency, such as a board or a commission, must prescribe adequate standards expressed in the statute or inherent in its subject matter and such standards must be sufficient to guide such agency in the exercise of the power conferred upon it.

In comparison to the statutory guidance given to the school building authority in *Wagoner II*, we cannot concur with the trial court's ruling that the statutory guidelines provided in West Virginia Code § 29–22–18a(d)(3) are sufficient to withstand a challenge predicated on wrongful delegation of legislative powers. *See* W.Va. Const. art. VI, § 1. The following statutory guidance was provided for selecting among the various entities competing for school construction funds in *Wagoner II:*

(a) It is the intent of the Legislature to empower the school building authority to facilitate and provide state funds for the construction and maintenance of school facilities so as to meet the educational needs of the people of this state in an efficient and economical manner. The authority shall make funding determinations in accordance with the provisions of this article and shall assess existing school facilities and each facility's plan in relation to the needs of the individual student, the general school population, the communities served

by the facilities and facility needs statewide.

W.Va.Code § 18–9D–15(a) (1993).

Whereas the statute in *Wagoner II* gave a comprehensive listing of funding standards along with a clear statement of legislative intent, thereby avoiding the concern raised in *Douglas* that caprice would control the decision making process in the absence of clear guidelines, the statute currently under scrutiny contains no comparable guidance. *See* 568 P.2d at 534. And, unlike the specificity included in that statute at issue in *Wagoner II*,[34] the State Lottery Act provisions at issue here contain only the broadest statement of legislative intent and fail to include even a hint of standards for the Grant Committee's use in exercising its statutorily specified duties. *See* W.Va.Code § 29–22–18a(d). The Committee had no measuring stick, other than its self-created criteria, to rely upon in attempting to fulfill the legislative objective of economic development. Critically, the evaluative criteria adopted by the committee itself cannot constitute the legislative guidance necessary to withstand a wrongful delegation of powers challenge.

■ To be clear, we do not imply a need to return to the days when courts sometimes imposed onerous requirements on the legislative and executive departments, thereby limiting the legislative branch's capacity to assign functions to the executive branch with only broad directives for implementing public policy. Nonetheless, the Legislature must articulate with sufficient clarity its public policy objectives to permit the executive department to effectuate those policy objectives and to educate the public as to the legislature's intentions.[35] We made clear in *Polan* that the Legislature cannot "grant . . . unbridled authority in the exercise of the power conferred upon . . . [an administrative agency]." Syl. Pt. 2, in part, 190 W.Va. at 277, 438 S.E.2d at 309.

At the core of CAG's contention is the fact that the Committee is authorized to select largely undefined projects *without the benefit*

---

**34.** W. Va.Code § 18–9D–15(a).

**35.** Even a cursory review of the projects approved by the Grant Committee reveals that not

all of those projects can result in the statutory objective of economic development. *See* W.Va. Code § 29–22–18a(d).

*of any legislative guidance* and that such projects, while required to serve a public purpose, in some instances clearly appear to also involve private undertakings or interests. Add to this concern, the fact that the legislatively approved expenditure of 215 million dollars of public funds involves borrowing—through the sale of bonds—and that the repayment of such public moneys is secured only by the "excess profits" of the state lottery over a lengthy period of time. Of further concern to those objecting to this economic development plan is the fact that the funds at issue will be largely extended by means of grants, rather than loans, and that little, if any, of such funds may be required to be repaid.[36]

All of these validly raised objections serve to further underscore this Court's grave responsibility to carefully evaluate the constitutional imperatives implicated by the legislative plan to effect economic development through the statutory mechanism outlined in West Virginia Code § 29–22–18a(d)(3). Cognizant of our constitutional duties, we recognize that the power extended to the Grant Committee by the Legislature to exclusively select which projects may benefit from receipt of state funds must be exercised in conjunction with definitively announced legislative standards by which the Committee can appropriately evaluate the submitted projects for purposes of assuring that the selected projects will meet the legislated public purpose of economic development.

■ In this Court's opinion, the legislation at issue has conferred "uncontrolled discretion" upon the Grant Committee by virtue of the lack of legislative guidance provided for determining the bases by which the grant applications should be considered. *See Polan*, 190 W.Va. at 280, 438 S.E.2d at 312. Accordingly, we hold that when an enabling statute such as West Virginia Code § 29–22–

18a(d)(3) extends discretion to the executive branch in contemplation of an expenditure of public funds with only a broad statement of legislative intent and insufficient legislative guidance for the execution of that legislative intent, the Legislature has wrongfully delegated its powers to legislate in violation of article six, section one of the state constitution. *See* W.Va. Const. art. VI, § 1. Before the Grant Committee, upon its reconstitution, proceeds to implement the statute at issue, the Legislature is required to amend the subject legislation to provide the necessary standards that the Committee must apply in identifying and certifying projects selected for receipt of state funds pursuant to West Virginia Code § 29–22–18a(d).

While we do not intend to identify what those standards should be—as that is a legislative determination—we emphasize that to withstand constitutional scrutiny the Legislature must provide the Committee with sufficient guidance so that the Committee's allocation decisions can be made with a clear understanding of the type of contemplated economic development it should be seeking to fund. As it stands now, the Legislature has failed to instruct the Committee even as to the general nature of projects which are encompassed within the statutory purview of economic development.[37] In short, suitable legislative standards for achieving the laudable goal of economic development have simply not been provided.

### C. Undertaking State Debt and Extending State's Credit

Another ground upon which CAG challenges the legislation at issue involves the contention that West Virginia Code § 29–22–18a(d)(3) runs afoul of two constitutional provisions prohibiting the undertaking of debt by the state and the extension of credit by the state to private entities. We will exam-

---

**36.** A related financial concern is that the resulting obligations, while not formally secured by the state's tax revenues, will nonetheless bear on the overall evaluation of the state's credit worthiness.

**37.** For example, the criteria previously adopted by the Committee could constitute part of the necessary statutory guidance. We further note that the Legislature may authorize the Grant

Committee to adopt such rules—legislative, interpretive, or procedural—as may be appropriate to implement, explain, or administer the legislative objectives and standards set forth in the subject legislation. Such rules may be subject to Chapter 29A of the West Virginia Code in its entirety, or exempted in whole or in part, as the Legislature may deem appropriate.

ine these two constitutional claims separately.

### 1. Article X, Section 4

CAG argues that the legislation at issue is in contravention of the constitutional provision stating that "[n]o debt shall be contracted by this State." W.Va. Const. art. X, § 4. As we explained in *State ex rel. Board of Governors v. O'Brien*, 142 W.Va. 88, 94 S.E.2d 446 (1956), this provision "was intended to prohibit the creation of debts, by the State, required to be repaid by a public tax." *Id.* at 97, 94 S.E.2d at 451; *accord State ex rel. W.Va. Regl. Jail Auth. v. W.Va. Inv. Mgt. Bd.*, 203 W.Va. 413, 421, 508 S.E.2d 130, 138 (1998) (stating that "[t]his Court has defined the basic intent and purpose of Article X, Section 4 as prohibiting legislative acts which would bind subsequent legislatures to appropriate money in subsequent fiscal years"). In *O'Brien*, we applied this concept to hold that revenue bonds statutorily authorized[38] to be issued by the board of governors to finance certain buildings at West Virginia University which were payable solely from a special fund comprised of student fees did not create a debt in violation of article ten, section four. Our decision made clear that the constitutional concern presented by article ten, section four is the levying of a tax to satisfy the obligation of debt undertaken by the state. 142 W.Va. at 97, 94 S.E.2d at 451.

Focusing on the distinction between an involuntary tax which is paid under compulsion and the voluntary payment of fees or costs, we upheld legislation authorizing a portion of proceeds from the sale of alcoholic beverages to pay off bonds issued to finance buildings utilized by certain state agencies and departments. *See State ex rel. State Bldg. Commn. v. Moore*, 155 W.Va. 212, 234, 184 S.E.2d 94, 107 (1971). As in *O'Brien*, the constitutional provision proscribing debt was avoided because the bonds at issue were not being paid for through imposition of a tax, but instead "from the action of the members of the public who, on a wholly voluntary basis, purchase alcoholic liquors from the state." *Id.* at 234, 184 S.E.2d at 107.

Both *Moore* and *O'Brien* fall into that category of cases, referred to as the " 'special fund doctrine' " decisions, where challenged legislation has been determined not to be violative of article ten, section four based on the non-involvement of the state's general tax revenues. *State ex rel. Hall v. Taylor*, 154 W.Va. 659, 670, 178 S.E.2d 48, 55 (1971), *overruled on other grounds by State ex rel. Resource Recovery–Solid Waste Disposal Auth. v. Gill*, 174 W.Va. 109, 111, 323 S.E.2d 590, 592–593 (1984). In explaining this doctrine, we stated:

> "[I]t has generally been held that an obligation payable from a special fund created by the imposition of fees, penalties, or excise taxes, and for the payment of which the general credit of the state is not pledged and resort may not be had to property taxation, is not a debt within the meaning of constitutional debt limitations. Such a limitation applies solely to that arising from a general levy and not excise taxes."

*Id.* at 670–71, 178 S.E.2d at 55 (quoting 49 Am.Jur. *States, Territories, and Dependencies*, § 67). Acknowledging that a precise definition of the "special" or "separate" fund doctrine is difficult, we observed in *Taylor* that it is

> uniformly held, however, that the doctrine cannot be applied to a fund which is created and maintained, in whole or in part, by general tax revenues, for the reason that such would clearly violate the purpose and intent of constitutional provisions such as that involved in this case [art. X, § 4]. The basic intent and purpose of such constitutional provisions is to prohibit any legislative act which would bind subsequent legislatures to make appropriations of moneys in subsequent fiscal years.

154 W.Va. at 672–73, 178 S.E.2d at 56.

In upholding the subject legislation with regard to the inhibitory debt provisions of section four of article ten, the circuit court looked to this Court's rulings in *State ex rel. Marockie v. Wagoner (Wagoner I )*, 190 W.Va. 467, 438 S.E.2d 810 (1993), *overruled on other grounds by State ex rel. W.Va. Regl.*

---

**38.** *See* W.Va.Code §§ 18–11A–1 *et seq.* (1956).

*Jail Auth. v. W.Va. Inv. Mgt. Bd.*, 203 W.Va. 413, 421, 508 S.E.2d 130, 138 (1998). *Wagoner I* concerned the constitutionality of issuing revenue bonds for school building fund purposes to be paid from a portion of the previously established consumer sales tax receipts. Through that decision, we confirmed the well-established principle that " '[s]ection 4 of Article X of the West Virginia Constitution ... does ... [not] preclude the issuance of revenue bonds which are to be redeemed from a special fund.' " *Id.* at 468, 438 S.E.2d at 811, syl. pt. 1, in part (quoting Syl. Pt. 6, *Winkler v. State of W.Va. Sch. Bldg. Auth.*, 189 W.Va. 748, 434 S.E.2d 420 (1993)). In striking down the designated special revenue fund created from consumer sales tax revenues in *Wagoner I*, we clarified that:

> The Legislature may not designate funds that will be used to liquidate a revenue bond issue out of a current tax source that flows into the general revenue fund. If this practice were permitted, then a debt would be created that would burden the existing general revenue fund in violation of Section 4 of Article X of the West Virginia Constitution.

Syl. Pt. 2, *Wagoner I*, 190 W.Va. at 468, 438 S.E.2d at 811.

■ The Legislature responded to the constitutional impediment recognized by the *Wagoner I* ruling and amended West Virginia Code § 18–9D–6(b) (1993) to create a special fund known as the school building debt service fund that consists of moneys allocated from the net profits of the West Virginia Lottery. *See* W.Va.Code § 29–22–18(h) (1994). In upholding this funding mechanism, we held that:

> This method of funding the School Building Authority's revenue bonds does not violate section 4 of article X of the *West Virginia Constitution* since the monies al-

located to the school building debt service fund are a new revenue source and since the legislature specifically provided in *W.Va.Code*, 29–22–18 [1990 and 1994] that the net profits from the West Virginia Lottery are not to be treated as part of the general revenue of the State.

Syl. Pt. 3, in part, *Wagoner II*, 191 W.Va. at 462, 446 S.E.2d at 684.[39] We noted that while the lottery profits were initially made part of the general revenue fund, beginning in 1990 those funds were specifically designated for specified purposes and the Legislature expressly mandated that the lottery revenues "shall not be treated ... as part of the general revenue of the state." *Id.* at 465–66, 446 S.E.2d at 687–88 (quoting W.Va.Code § 29–22–18(g) (1990)).

In concluding that the subject legislation does not violate article ten, section 4, the circuit court applied the principles discussed in the *Wagoner* decisions, as well as our earlier decisions in *O'Brien, Taylor,* and *Moore.* To reach its ultimate determination that the "State's general revenues are not implicated" by the subject legislation, the circuit court first examined whether the "special revenue fund" doctrine would apply. Looking to the statutory provisions at issue, the lower court determined that West Virginia Code § 29–22–18a(a) clearly created a "special revenue fund" within the State Lottery Fund, and then concluded that the Economic Development Project Fund, "although not denominated a special fund, clearly is one." The lower court, while correct in its conclusion, overlooked the statutory language that expressly designates the Economic Development Project Fund as a "special revenue" fund. W.Va.Code § 29–22–18a(d)(2). In addition, the lower court found significant the fact that "the bonds shall be payable solely from the special fund provided in this section for the payment." W.Va.Code § 29–

**39.** We rejected the contention raised in *Wagoner II* that the designation of the special revenue fund would still affect the general revenue by requiring additional funding to those programs that were originally funded through lottery proceeds. Referencing the *O'Brien* decision in which we upheld the constitutionality of a special fund funded by student fees, we reasoned:

> Implicit in that decision is the fact that additional funding would have to be created in

order to fund those projects which had been previously funded by revenue which would be going to the special revenue fund. *O'Brien* makes it clear that the important question is whether the funding for the bonds creates an unconstitutional debt, not how will other projects originally funded by the special fund continue to be funded.

191 W.Va. at 465, 446 S.E.2d at 687 (citation omitted).

22–18a(d)(1). As further support for the Legislature's intention that the general revenues of this state never be called upon to pay off the subject bonds, the circuit court noted that the statute expressly contemplates the possibility of insufficient funds in a given month to cover the allocated one tenth of the projected annual principal, interest and coverage requirements. In such event, the "deficiency shall be added to the amount transferred in the next succeeding month in which revenues are available to transfer the deficiency." W.Va.Code § 29–22–18a(g).

■ Based on all of these factors, we are convinced that the financing mechanism established for payment of the revenue bonds that will be issued in connection with the selected grant projects properly comes within the "special revenue fund" doctrine. Given the Legislature's carefully constructed financing mechanism, we do not find any basis for concluding that the bond repayment schema under consideration can negatively affect the fiscal integrity of the state.[40] We reach this conclusion based on the fact that the bonds will not be satisfied out of general revenue appropriations. Accordingly, the concerns underlying the provisions of article ten, section four are not implicated by the subject legislation.

**40.** To avoid any confusion regarding this issue, however, it is both advisable and required that the enabling legislation, as well as all supporting documentation incident to bond sales arising in connection with West Virginia Code § 29–22–18a, clearly state that the bonds do not constitute a debt of the state; that payment of the bonds, interest, and charges thereon cannot become an obligation of the state; and that the bondholders' remedies are limited in all respects to the "special revenue fund" established for the liquidation of this obligation.

**41.** The essence of section six was contained in the original constitution of West Virginia adopted in 1863. During the extensive debates that took place with regard to both sections six and four of article ten, there was much discussion regarding the construction of "internal improvements" in the eastern part of the state, to the exclusion of much of what is now West Virginia. *See Debates and Procs. of the First Const'l Conv. of W.Va.*, Vol. III, pp. 127 to 276 (1861–63). In explaining the historical basis for these constitutional provisions, we stated in *Bates v. State Bridge Commission*, 109 W.Va. 186, 153 S.E. 305 (1930):

When our Constitution of 1872 was formed, the experience of the mother state with debts contracted by her, and with suits to compel

## 2. Article X, Section 6

■ CAG argues that the subject legislation violates the provisions of article ten, section six by wrongly extending public aid for the benefit of private interests. The pertinent language of this constitutional provision provides: "The credit of the state shall not be granted to, or in aid of any county, city, township, corporation or person; nor shall the state ever assume, or become responsible for the debts or liabilities of any county, city, township, corporation or person." W.Va. Const. art. X, § 6. As we explained in syllabus point five of *Winkler*: "The plain language of Section 6 of Article X of the West Virginia Constitution is designed to restrict the State from granting credit to subordinate political subdivisions such as municipalities and counties, as well as to forbid the State from granting credit or assuming liabilities for debts of private persons or other entities." 189 W.Va. at 750, 434 S.E.2d at 422.

Section six of article ten was made a part of our state constitution to avoid a specific historical problem encountered by Virginia: [41]

The purposes of the section [art. X, § 6] are well known, being to guard against the

payment, were fresh in the minds of the framers of that Constitution. Numerous suits ending in heavy judgments and costs had been prosecuted against the commonwealth; illiberal contracts and guaranties of enterprises had been made by governmental agencies detrimental to her interests; public officers and agencies had not been always zealous and careful in the conduct of public affairs; and juries leaned toward the individual as against the commonwealth.

*Id.* at 188–89, 153 S.E. at 306–07.

While we find no constitutional impediment to the statute under consideration based on sections four and six of article ten of our state constitution given long standing precedent governing the use of the "special revenue" source of funding, the historical underpinnings of these sections nonetheless maintain an illuminating degree of relevance with regard to the favoritism concerns raised by CAG in this action. We cannot but note that the admonitions of our forefathers concerning the potential unfairness involved through the support of some "internal improvements" to the exclusion of others, still have continuing merit today.

mistakes of the mother Commonwealth of Virginia in granting aid to counties, and particularly in granting aid to organizations for the purposes of so-called public improvements, and in becoming stockholders of such organizations. It was not, we think, intended to inhibit the use of the State's funds in carrying out public purposes .... We do not think it inhibits the organization of public corporations for the purpose of carrying out governmental purposes.

*State ex rel. Dyer v. Sims,* 134 W.Va. 278, 289–90, 58 .S.E.2d 766, 773 (1950), *rev'd on other grounds,* 341 U.S. 22, 71 S.Ct. 557, 95 L.Ed. 713 (1951); *accord State ex rel. Appalachian Power Co. v. Gainer,* 149 W.Va. 740, 759, 143 S.E.2d 351, 364 (1965) (recognizing that article ten, section six "was inserted in the Constitution primarily to prevent the practice which obtained earlier in Virginia of lending the state's credit to counties or to private internal development projects such as railroads, canals, toll roads and turnpikes").

■ The objective of section six of article ten, like that of section four of that same article, is to protect the fiscal integrity of the state through the stated means of "restricting the Legislature's ability to create long-term debt." *Winkler,* 189 W.Va. at 755, 434 S.E.2d at 427 (citing *Gill,* 174 W.Va. at 111, 323 S.E.2d at 592–593). For essentially the same reasons the subject legislation does not implicate the concerns at issue in section four of article ten, it fails to invoke the credit or debt concerns at the center of section six. As the circuit court aptly determined: "Since the bonds are required to be repaid from the Economic Development Project Fund, a special revenue fund, and not out of compulsory tax payments, the credit of the State is not implicated." The bond financing and repayment provisions delineated in West Virginia Code § 29–22–18a(d) do not create a lien against the general revenue of the state because the bonds are to be repaid solely from a special revenue source—excess lottery funds that are not part of the general revenue of the state. As the provisions of the subject legislation make clear, there is no assumption by the state of any debt or liability of any political subdivision, county, city, township, corporation, or person.

■ In arguing that article ten, section six is violated based almost entirely on whether the legislation at issue serves a public purpose, CAG overlooks the provision's primary objective of securing the state's fiscal integrity. While it is axiomatic that legislative appropriations must serve a public purpose,[42] that is not the constitutional concern, as discussed above, which article ten, section six is aimed at safeguarding. Nonetheless, the law is well established with regard to the public purpose doctrine: "A legislative declaration of purpose, while not conclusive, is entitled not only to respect but to a prima facie acceptance of its correctness." Syl. Pt. 6, *Waterhouse,* 158 W.Va. at 197, 212 S.E.2d at 726. Moreover, "[a] legislative determination of what is a public purpose will not be interfered with by the courts unless the judicial mind conceives it to be without reasonable relation to the public interest." *Gainer,* 149 W.Va. at 750, 143 S.E.2d at 359.

The Legislature has provided a clear statement of the public purpose which it seeks to serve through the provisions of West Virginia Code § 29–22–18a(d). The intended object of the subject legislation is economic development and the anticipated benefit of utilizing the grant moneys for such development is both to "retain existing business and industry [and thereby provide] the citizens of this state with economic security" and "to attract new business, commerce and industry." *Id.* While CAG vigorously challenges the Legislature's objective of advancing the economic interests of this state through commercial development,[43] this Court recognized the worth of commercial development more than twenty years ago in *State ex rel. Ohio County Commission v. Samol,* 165 W.Va. 714, 275 S.E.2d 2 (1980), stating:

---

**42.** *See State ex rel. Bd. of Govs. of W.Va. Univ. v. Sims,* 133 W.Va. 239, 245, 55 S.E.2d 505, 508 (1949) ("It is well settled in this State that the Legislature may appropriate money for public purpose but for no other purpose.").

**43.** CAG submits that only industrial types of development will result in the desired economic development.

It does not require any lengthy discussion to realize that the renovation, expansion or creation of existing or new commercial projects gives much the same economic benefit to a community as would comparable activities in the industrial area. Each serves to create or maintain employment and enhance tax revenues, and thereby operates to benefit the community and public in general.

*Id.* at 718, 275 S.E.2d at 4.

■ Rather than being static in nature, the public purpose doctrine, because of its inherent responsiveness to societal needs and demands, is ever changing: "What constitutes a public purpose varies with changing conceptions of the scope and function of government. As governmental activities increase by reason of the growing complexity of various phases of society, the concept of 'public purpose' expands proportionately." *Waterhouse,* 158 W.Va. at 215, 212 S.E.2d at 735. Addressing both the fluidity of the public purpose doctrine and how economic development fits into that doctrine, the South Carolina Supreme Court articulated:

"Times change. The wants and necessities of the people change ... On the one hand, what could not be deemed a public use a century ago may, because of changed economic and industrial conditions, be such today."

"The consensus of modern legislative and judicial thinking is to broaden the scope of activities which may be classed as involving a public purpose. 37 Am.Jur., Municipal Corporations, Sec. 132. It reaches perhaps its broadest extent under the view that *economic welfare* is one of the main concerns of the city, state and the federal governments." [Emphasis supplied].

*Nichols v. S.C. Research Auth.,* 290 S.C. 415, 351 S.E.2d 155, 161 (1986) (additional citations omitted); *see also State ex rel. Brown v. City of Warr Acres,* 946 P.2d 1140, 1146 (Okla.1997) (Summers and Watt, J., concurring) (observing that "[w]hether a sufficient public purpose exists behind a city's expenditure of a public money for an economic development plan should be measured

by contemporary economic challenges faced by municipalities").

■ While legislative action is required to serve the public, rather than private interests, the realization of incidental benefits by private entities as a result of legislative efforts does not render the legislation unconstitutional for lack of a public purpose. As the Oklahoma Supreme Court remarked in *Warr Acres:*

Municipalities today compete on a nation-wide level to attract new industry into their locality. A city cannot compete with other cities or even other states if other cities and states are competing with inducements devised under contemporary economic development plans.... This has been recognized in other states, as courts have construed public purpose requirements for the expenditure of public funds to encompass ever changing public needs and adapt to the ever increasing competition for industry development. *Economic development plans devised to provide gainful employment, improve living conditions, attract industry and advance the economy, like the plan at issue here, in which the public benefits greatly outweigh the incidental benefit to a private person or corporation have been upheld.*

*Id.* at 1148 and cases cited therein (Summers and Watt, J., concurring) (emphasis supplied).

Many years ago this Court addressed the "broad sphere of permissible governmental activity in areas where the Legislature determines that government action is a necessary supplement to private enterprise to alleviate social problems." *State ex rel. City of Charleston v. Coghill,* 156 W.Va. 877, 881, 207 S.E.2d 113, 116 (1973). In ruling upon enabling legislation authorizing the City of Charleston to determine the amount of space in a public parking facility which would be leased to a private enterprise, this Court upheld public parking as a validly declared public purpose where the statement of legislative intent included the objective of " 'fostering the development of commerce and business within municipalities.' " *Id.* at 880, 207 S.E.2d at 116 (quoting West Virginia Code § 8–16–4a(a)). Acknowledging that

private interests might be affected through this legislation, we stated,

> although a parking facility designed for an acknowledged public purpose is constitutional, even though it confers ancillary and incidental benefits upon private persons, a parking facility which has as its primary and dominant purpose the conferring of private benefits, with only ancillary public benefits, would be an unconstitutional use of authority. . . .

156 W.Va. at 884, 207 S.E.2d at 118. This Court has similarly upheld various legislative acts against public purpose challenges despite the existence of incidental benefits to private interests. *See Copenhaver,* 153 W.Va. at 650, 171 S.E.2d at 554 (upholding West Virginia Housing Development Fund legislation enacted to provide public housing assistance); *Gainer,* 149 W.Va. 740, 143 S.E.2d 351 (upholding statute authorizing reimbursement of public utilities for relocation costs necessitated by highway construction on public purpose grounds against challenge of unconstitutionally extending state's credit); *State ex rel. County Court of Marion Co. v. Demus,* 148 W.Va. 398, 135 S.E.2d 352 (1964) (upholding Industrial Development Bond Act providing for issuance of self-liquidating bonds against challenge that legislation constituted an indirect granting of credit to private corporation); *State ex rel. W.Va. Bd. of Educ. v. Sims,* 139 W.Va. 802, 81 S.E.2d 665 (1954) (upholding legislation granting paid sabbatical leave to faculty of state educational institutions on public purpose grounds, while recognizing incidental personal benefit to faculty); *State ex rel. Bd. of Govs. of W.Va. Univ. v. Sims,* 134 W.Va. 428, 59 S.E.2d 705 (1950) (directing state auditor to pay medical costs of injuries incurred by student athlete in intercollegiate contest and finding public purpose in statute authorizing discretionary payment of such costs); *State ex rel. Bd. of Govs. of W.Va. Univ. v. Sims,* 133 W.Va. 239, 55 S.E.2d 505 (1949) (upholding legislation authorizing government pensions, finding that public benefit outweighed any ancillary private benefit).

In ruling on the public purpose of the economic development at issue, the circuit court opined:

> The legislature apparently believes that downtown redevelopment districts will promote the vitality of retail business areas within municipalities, serve as an effective means for restoring and promoting retail and other business activity within said districts, will benefit municipalities by increasing the tax base within said downtown redevelopment district and will stimulate economic growth and job creation. While the Court cannot say that all of the anticipated results will necessarily flow from the creation of downtown redevelopment districts, it can be said that all of these stated purposes serve legitimate public purposes. (citation omitted)

Like the circuit court, we find that the Legislatively declared objective of economic development is a valid public purpose, deserving of both judicial respect and occasion for the desired economic development to take place. Accordingly, we find no basis for interfering with the subject legislation on public purpose grounds.

### D. Reevaluation of Projects

Through the record developed below, the circuit court found that the projects selected by the Grant Committee were properly chosen pursuant to the evaluative criteria adopted by the Committee. Because we have found a constitutional basis for requiring the reconstitution of the Committee, as well as a need for statutory inclusion of legislative standards for use in evaluating submitted projects, a newly comprised Committee will have to reconsider those previously approved projects and those submitted, but unapproved, applications against such standards upon their adoption.[44] Given the need to individually reconsider the grant applications,[45] it would be imprudent for this Court to comment on the merits of any of those projects. We do note, however, that

---

44. Because the Wheeling Project will similarly have to be reevaluated, we do not address the lower court's decision to require a reevaluation of that project.

45. Whether or not the deadline for grant applications should be extended in light of the need to reconstitute the Committee is up to the Legislature.

each of the projects, barring one, had a governmental partner, thereby underscoring the public purpose of such projects. In addition, we further perceive that the Legislature's reposition of broad discretion in the Committee for selecting the list of economic development projects deserving of public funding will meet with increased public acceptance and, therefore, a decreased incidence of challenge and consequent delays in implementing the projects, if the Committee opts to make a full record of its proceedings and decisions for the purpose of evidencing that its actions are in accord with the public purpose objectives of the subject legislation and the enunciated legislative standards.

## IV. Conclusion

Based on the foregoing, we conclude that the appointment mechanism for the Grant Committee contained in West Virginia Code § 29–22–18a(d)(3) violates the separation of powers provision of the state constitution found in article five, section one and the appointments provision found in article seven, section eight. We further determine that, based upon the lack of sufficient standards provided for the Committee's use in evaluating the submitted grant projects pursuant to the provisions of West Virginia Code § 29–22–18a(d)(3), the Legislature has wrongfully delegated its powers in violation of article six, section one of our state constitution. Due to these constitutional infirmities, the actions previously taken by the Committee with regard to approving various grant applications are of no force and effect. Accordingly, the decision of the Circuit Court of Kanawha County is hereby affirmed with regard to the lower court's upholding of the statutory provisions which govern the bond issuance and repayment mechanisms, but reversed as to the lower court's findings regarding the constitutionality of the appointment process and delegation of legislative power.

Assuming that the Legislature desires to proceed with this statutory approach of encouraging economic development, it is incumbent upon the Legislature to amend the subject legislation to provide for the executive appointment of the members of the Grant Committee without use of a submitted list of nominees from the presiding officers of the two houses of the Legislature and to further provide the necessary guidance in the form of legislative standards that will enable the Committee to perform its statutory task of reviewing and selecting among the submitted project applications in accord with the announced legislative objective of economic development.

Given the need for legislative action to effect the amendments necessary to correct the constitutional infirmities recognized in this opinion, we hereby direct the entry of the necessary order and the issuance of the mandate pertaining to this decision forthwith.

Affirmed, in part, Reversed, in part.

McGRAW, Justice, concurring, in part, and dissenting, in part.

With that portion of the majority's opinion which holds unconstitutional the mechanism by which six members of the Grant Committee are appointed, under *W.Va.Code* § 29–22–18a(d)(3), I concur. The separation of powers and appointments provisions of our State Constitution clearly prohibit this type of legislative encroachment on the powers of the executive branch. However, while the appointment mechanism utilized by the Legislature was constitutionally flawed, I believe the Grant Committee's initial approval of the projects should be permitted to stand.

Additionally, without hesitation, I respectfully dissent from the majority's holding that the instant statute violates the delegation of powers provision. Accordingly, I believe the projects approved by the Grant Committee should be allowed to immediately proceed.

It is beyond cavil that those projects which were approved by the Grant Committee in the first instance will be approved *again* by the reconstituted Committee. Thus, the majority's hyper-technical resolution of this issue serves no practical purpose other than to unnecessarily delay the commencement of projects sorely needed throughout this State. The majority expressly invites the executive to re-appoint the original Committee members to the new Committee on the ground that the unconstitutional "taint" attaches to

the appointment process rather than to the individual Committee members. Simply put, considering the composition and votes of the new Grant Committee will *remain exactly the same* as the first one, the judicially-imposed requirement that the long and arduous application process be repeated only so that the very same projects will be re-approved, is an exercise in futility. In my view, the more judicious solution would be to allow the votes of the remaining three, lawfully appointed members of the Grant Committee to stand, all of which votes, presumably, were favorable to each of the previously-approved projects.

I further disagree with the majority's holding that the subject legislation violates the delegation of powers provision of our State Constitution because it does not include sufficient statutory guidance to the Grant Committee to assist it in the project application and selection process. Inexplicably, the majority opinion fails to provide any analysis, meaningful or otherwise, of the specific statutory language it finds objectionable and therefore, unconstitutional.

To the contrary, I find the language of *W.Va.Code* § 29–22–18a(d) [1] to be more than adequate in providing guidance to the Grant Committee in its decision-making process; indeed, the guidelines included in *W.Va.Code* § 29–22–18a(d) are at least equal to the statutory guidance given to the school building authority, which was upheld by this Court in *State ex rel. Marockie v. Wagoner (Wagoner II), supra.*

Finally, I am reminded that the genesis of establishing the economic development project fund was to assist in the funding of the Victorian Mall project in Wheeling, West Virginia. The purpose of that project was to stimulate the economy of that city's downtown area, which was once a vital business and retail district that, like many towns in West Virginia and across the nation, has fallen on hard financial times. Were it not

for the Victorian Mall project, which has not yet been approved by the Grant Committee, the special revenue fund at issue might not have ever been created. I believe that project should have been approved in the first instance.

For these reasons, I respectfully concur in part, and dissent in part from the Court's opinion in this case.

STARCHER, C.J., concurring.

I concur in the majority opinion and write separately to make several points.

First, this Court is constitutionally charged with determining the constitutionality of a statute when challenged. In this case a majority of the Court determined that the statutory scheme in question is constitutionally defective. But this is not the end of the world. Little time should be lost for any proposed public projects, provided that the Legislature and the Executive act promptly to remedy the constitutional defect.

Second, the petitioner CAG was aware in March of 2002 of the statutory procedure for appointing the Grant Committee and the language establishing its duties. CAG could have brought this lawsuit at that time, yet they waited until September of 2002—until the Committee had essentially completed its work—to file this lawsuit. Therefore, the delay in the legal resolution of this case must first and foremost be laid squarely at the feet of CAG.

Third, this Court first properly sent the case for factual development to the circuit court; it would have been a mistake to jump in without giving the parties a full chance to develop the record. And although this Court disagrees with *some* of the legal conclusions reached by the circuit court, it is clear that Judge King proceeded deliberately and carefully, and produced a legally creditable result that deserves appreciation.

---

1. *W.Va.Code* § 29–22–18a(d) provides:

The Legislature finds and declares that in order to attract new business, commerce and industry o this state, to retain existing business and industry and industry providing the citizens of this state with economic security and to advance the business prosperity of this state

and the economic welfare of the citizens of this state, it is necessary to provide public financial support for constructing, equipping, improving and maintaining economic development projects, capital improvement projects and infrastructure which promote economic development in this state.

Fourth, the constitutional defects of the legislation creating the Grant Committee can be summarized in two statements.

A. The Legislature cannot just give a Grant Committee a pot of money and tell them to "go do good stuff." That is constitutionally impermissible—there must be some real standards set by law, not just by the Committee itself on an *ad hoc* basis.

B. Additionally, the Legislature cannot "pick the jury pool" from whom the Governor selects appointees—this violates elementary principles of the separation of powers. As Justice Maynard aptly questioned at the oral argument of this case: "Don't we have lawyers [at the Legislature] who look at this, for God's sake?"

Fifth, whether any or all of the proposed projects will survive standards established by the Legislature will be up to the Grant Committee. Nevertheless, I will personally state my belief that CAG's explicit argument that helping to build projects like baseball parks and to refurbish downtown shopping areas with public funds is unconstitutional—because those are not "public purposes"—is hogwash. I can think of few more public purposes than bringing people together for the convivial recreation of live local sporting events. And to suggest that preserving an extraordinary Victorian-era city center for future generations is not a public purpose defies rational explanation. CAG is way off base here.

Sixth, the majority opinion offers some suggestion as to how the essentially procedural defects in the Grant Committee's appointment and standardless delegation of duties might be remedied. I will add one remark to that discussion, although as the majority opinion clearly notes, it is not a court's job to write legislation.

My addition, which I admittedly have given little thought to, is that now that the majority of this Court has ruled for the Grant Committee on the "debt" and "public purpose" issues, I do not presently perceive any legal obstacle to the Legislature passing a bill that appropriates bond money based on future lottery revenues for as many of the projects selected by the Grant Committee as the Legislature wishes. And the timing of such action would be determined by the Legislature and the Executive. It could be done right away.

*Perhaps* such legislation would face a challenge raising other legal issues, and I explicitly don't prejudge any issues raised in such a challenge. But, without the benefit of argument to the contrary, I don't see why the Legislature could not theoretically perform such a "fix"—if it wishes to go that route. Regardless of the route selected, a constitutional remedy can be done posthaste.

Seventh, I recognize that this Court *could* have acknowledged the constitutional defects in the Grant Committee legislation, and still approved of the results of the work of the Committee. In *State ex rel. Holmes v. Gainer*, 191 W.Va. 686, 447 S.E.2d 887 (1994), this Court, this Court found that a legislative pay raise had been put in place in violation of a constitutional timing requirement—but because it was a "technical" mistake in an area where the law was unclear, this Court approved the legislative pay raise—and said, in effect, "Go and sin no more."

Could and should we have said—"go and sin no more"—in this case?

I judge "no"—not with more than $200 million of public dollars at stake. That would send a message that a statute could violate basic constitutional principles, but this Court would nevertheless approve the results of the statute for political expediency or because—quite frankly—there were "thousands of jobs at stake."

Jobs are important, and if I had thought the majority opinion as a matter of law would essentially prohibit the creation of most of the thousands of jobs anticipated in the Grant Committee results, I would have weighed that factor into my judgment, as well as the seriousness of the constitutional flaws in the statute creating the Committee. But my judgment—of course, I could be wrong—is that many or even most of the jobs that would be created by the projects approved by the Grant Committee could be soon forthcoming, if the Legislature and the Executive act in a timely fashion.

In this vein, I feel the need to clearly state (I believe that no one would quarrel with this statement) that this Court applauds the energy, imagination, and courage of those within and without the Legislature and executive branch who seek to advance the welfare of West Virginians through public support of commerce, education, and recreation—and that this Court supports the working women and men who construct and service the infrastructure of our economy. And I repeat—this is not the end of the world. Timely action by the Legislature and the Executive can cure the constitutional defects in the statutes in question, and the various proposed projects may promptly move forward.

Finally, this case was extremely well-developed, briefed, and argued—on both sides. The thorough, high-quality legal work of the advocates who presented their clients' positions made it possible for the Court's opinion to be well-grounded in precedent and logic.

MAYNARD, Justice, dissenting.

I must respectfully dissent to the majority opinion. I would uphold the constitutionality of the legislation at issue and allow the immediate sale of the bonds and construction of the projects approved by the grant committee.

Our law states:

> In considering the constitutionality of a legislative enactment, courts must exercise due restraint, in recognition of the principle of the separation of powers in government among the judicial, legislative and executive branches. Every reasonable construction must be resorted to by the courts in order to sustain constitutionality, and any reasonable doubt must be resolved in favor of the constitutionality of the legislative enactment in question. Courts are not concerned with questions relating to legislative policy. The general powers of the legislature, within constitutional limits, are almost plenary. In considering the constitutionality of an act of the legislature, the negation of legislative power must appear beyond reasonable doubt.

Syllabus Point 1, *State ex rel. Appalachian Power Co. v. Gainer,* 149 W.Va. 740, 143 S.E.2d 351 (1965). The majority errs by failing to resort to every reasonable construction to sustain the constitutionality of the legislation in question and by failing to resolve any reasonable doubt in favor of it. I simply do not believe that those challenging the legislation have met the burden of showing that it is unconstitutional beyond a reasonable doubt.

According to W.Va.Code § 29–22–18a(d)(3) (2002), the nine-person grant committee comprises,

> the governor, or his or her designee, the secretary of the department of tax and revenue, the executive director of the West Virginia development office, three persons appointed by the governor from a list of five names to be submitted to the governor by the president of the West Virginia senate, and three persons appointed by the governor from a list of five names to be submitted to the governor by the speaker of the West Virginia house of delegates.

A perfectly reasonable interpretation of this language is that it directs the Speaker of the House and the President of the Senate to suggest, advise, or nominate potential grant committee members, and that the ultimate appointment power resides in the Governor. By the express terms of the statute, the Governor, not the Speaker nor the Senate President, actually appoints the grant committee members. Further, I read the statute to indicate that the Governor is not obligated or bound to choose from the names submitted by the legislative leaders. For example, the Governor could request new lists from which to choose grant committee members.

Admittedly, the majority opinion is persuasive and well written. It is undeniable that the procedure for the appointment of grant committee members easily could have been drafted to better ensure the separation of legislative and executive powers as well as the Governor's unfettered use of his appointment power. However, whether the legislation at issue is less than perfect is not the question we should ask when determining its constitutionality. Instead, the question is whether this Court can give the statute *any* reasonable construction so as to uphold its constitutionality. Unfortunately, the majori-

ty opinion utilizes a hyper-technical analysis to reach a decision which simply is not legally inescapable. The majority could have reached the opposite conclusion just as easily while remaining true to sound constitutional principles. For the sake of the economic good of this State, I wish it had.

The majority's decision is based on a desire to protect the powers of the Governor granted by our Constitution. The members of this Court should be mindful, however, that we are not the only constitutional officers who took an oath to uphold the Constitution. The members of all three branches, including the Governor and the Legislators, also took such an oath. We are not the only guardians of the Constitution. Significantly, it was not the Governor who came before the courts challenging the legislation at issue. He apparently did not perceive any threat to his constitutional powers from the legislation. This is simply another reason why the Court should have been loath to find a statute unconstitutional when such a result was not absolutely mandated by our constitutional jurisprudence.

Some may think I am being "result oriented" and believe I am dissenting to the majority opinion because of a strong desire to see these projects built and to see economic development in the State. While I freely admit to a strong desire to see economic development, a desire I believe the majority shares just as strongly, that is simply not my reason for disagreeing with the majority. Rather, I am completely convinced that my conclusion that the legislation at issue is absolutely and fully constitutional is both in accord with this Court's prior constitutional decisions and based on sound judicial principles of statutory construction. While the legislation may not be a model of clarity, and in fact, it may not even be well written, and the mechanism it creates to fill these committee posts is unwise and unfortunate, it is *not* unconstitutional.

The majority obviously believes that the legislation's perceived constitutional defects can be easily and rapidly corrected. I fervently hope that this is so, and the economic projects can then proceed without undue delay. That would be a wonderful result! But no one really knows how long it will take for the Legislature to address these issues. After that, there is likely to be a new court challenge to the corrected legislation which could take months to wind its way through all the circuit court pleadings, hearings, motions, etc. This would be followed by another appeal to this Court, and the process would start all over again with preparation of the record below, then briefs and arguments here, all resulting in some further delay. I think it possibly could take many months and maybe a year or more to resolve.

Bond markets are notoriously jittery and nervous trading exchanges, and bond sellers and buyers are extremely cautious folks. I fear these bonds could not be sold during the period when litigation is still ongoing.

Clearly, the majority opinion will cause some delay which may or may not be significant. The plain fact is that the towns, cities, and counties that received economic grants for their respective projects need them desperately and need them *now!* Most of these projects concern improvements to infrastructure which will be of great help in creating real jobs for working people. Therefore, I hate to see these projects unnecessarily delayed even one more day.

For the reasons stated above, I would have found W.Va.Code § 29–22–18a(d)(3) to be constitutional. Accordingly, I respectfully dissent to the majority opinion.